[No. 1855.]

MACKEY v. BURNS ET AL.

1. CORPORATIONS—DIRECTORS—STOCKHOLDERS—TRUSTS AND TRUS-TEES.

The directors of a corporation occupy the position of trustees for the stockholders and their conduct with reference to, and dealings with, the corporate property is subject to the closest scrutiny, and the utmost good faith is required in the exercise of the powers conferred upon them.

2. CONTRACTS—RESCISSION.

If a contract is rescinded it must be rescinded in whole and the parties be relegated to their original rights in respect to the subject-matter. A party to a contract cannot ask the court to sustain that part of the contract which is beneficial to him and rescind that part which is not beneficial.

3. CORPORATIONS—MINING COMPANY—DIRECTORS—CONTRACTS.

Where a mining company owned a claim in conflict with other prior claims, and the company being without means the shareholders

donated to the company part of the shares of capital stock held by them to be used in acquiring other property, and some of the directors having individually purchased the conflicting claims, a transaction by which the individual directors conveyed to the company the conflicting claims in consideration of part of the shares of capital stock that had been turned into the treasury of the company for that purpose, does not come within the rule that makes a contract for the purchase of property of a corporation by the directors void *ab initio*.

4. SAME.

Where a mining company was involved in litigation by a number of adverse suits growing out of conflicts with senior locations, and the company had no money and no credit by which it could raise money, and certain of the directors of the company individually purchased the conflicting claims, and by unanimous vote of the directors conveyed the claims to the company in exchange for shares of capital stock of the company, which had been donated to the company by shareholders for the purpose of acquiring other property, and the transaction saved the company from its financial difficulties and proved greatly beneficial to every one of its shareholders, a court of equity will not listen with much satisfaction to the complaint of one of the beneficiaries of the transaction who seeks to have it annulled, and will not set aside such transaction upon any slight showing.

5. CORPORATIONS—DIRECTORS—PURCHASE OF CORPORATE PROPERTY.

All purchases of corporate property or assets by a director or directors of the corporation are not absolutely void.

6. SAME—RATIFICATION.

Where four of the five directors of a mining company individually purchased several older claims which conflicted with that of the company and afterwards conveyed the claims to the company in exchange for shares of the capital stock of the company that had been donated to the company by the shareholders for the purpose of acquiring other property, and after receiving the stock the directors notified all the stockholders that they could share in the stock thus received in proportion to the amount of stock of the company held by them and at the same price they paid for it, and all of the stockholders except one accepted and complied with the proposition, and that one was a director, and was present at the time and fixed the price at which the stock should be taken by the other directors and made the motion upon which the exchange was made, there was a ratification of the action of the directors by the stockholders as full and complete as if they had originally participated in and expressly authorized the transaction.

7. CORPORATIONS—CONTRACTS—DIRECTORS—STOCKHOLDERS.

Where certain of the directors of a mining company individually pur-

chased several claims in conflict with that of the company, and
agreed to deliver to the owners of the claims as part of the pur-
chase price, within a certain time, a certain number of shares of
the capital stock of the company, and the individual directors then
transferred the claims to the company in exchange for shares of
the capital stock, and the company as part of the consideration
issued directly to the original owners the shares agreed to be given
them by the directors, the original owners of the claims did not
become shareholders in the company until the issuance to them of
the stock, and could not as stockholders of the company maintain
an action to set aside the transaction between the company and
the individual directors by which the stock was exchanged for the
claims, as the exchange was completed before they became stock-
holders.

·8. Same.

Where the individual directors of a mining company purchased several
conflicting claims for which they agreed to deliver to the owners
of the claims as part of the purchase price, within a certain time,
a certain number of the shares of the capital stock of the company,
the fact that the individual directors when purchasing the claims
stated that they intended to convey the claims to the company, and
at the request of the owners stipulated in writing that they would
so convey them, did not constitute the directors trustees of the
company in the purchase, unless in fact the directors were acting
for and by authority of the company, so as to make the sale of the
claims a transaction between the owners of the claims and the
company that would make the claim owners equitable share owners
in the company.   Neither did a resolution adopted by the board of
directors after the property had been purchased by the individual
directors, authorizing the president and secretary of the company
to purchase the claims "from the present owners" and to issue in
payment therefor treasury stock of the company, a certain amount
in lieu of the cash paid by the purchasers and a certain other
amount given in payment of the claims by the purchasers, make
the original owners of the claims equitable share owners in the
company.

9. Corporations—Corporate Acts—Stockholders.

Corporate acts which may be lawfully done, and are done, by the con-
sent or authority of all the then stockholders cannot be questioned
by one who afterwards becomes a stockholder.

*Appeal from the District Court of El Paso County.*

Mr. L. J. Laws and Mr. Daniel Prescott, for appel-
lant.

Messrs. THOMAS, BRYANT & LEE, for appellees.

Messrs. GÜNNELL & HAMLIN and Messrs. PATTERSON, RICHARDSON & HAWKINS, of counsel.

WILSON, J.

To properly understand the issues involved and the opinion of this court, it will be necessary to give a somewhat extended statement of the facts, and the importance of the suit justifies it. We shall give only those which are undisputed or are clearly shown by the preponderating weight of the evidence. Several years prior to the occurrences upon which this suit is based, defendants Burns and Doyle, respectively, had located, and were the owners of, the Portland and Bobtail No. 2 lode mining claims, in Cripple Creek mining district. Subsequently, they had executed and delivered to one T. C. Condon, an option to purchase said claims at a stipulated price. In furtherance of this, Condon and his associates, in January, 1894, organized and incorporated the Portland Gold Mining Company, one of the defendants herein. Its capital stock was $3,000,000, divided into 3,000,000 shares of the par value of $1.00 each. In exchange for the entire capital stock of the company, fully paid, Mr. Condon and his associates transferred to the corporation the option upon the Portland and Bobtail No. 2, together with other options, agreements, leases and contract rights affecting other mining claims in the vicinity. Shortly thereafter, the promoters of the company being unable to perfect the purchase of the two claims mentioned, it was agreed that the owners thereof should convey the properties to the corporation upon the receipt of 834,000 of its shares. This agreement was carried into effect, and cotemporaneously therewith, or very shortly afterwards, Mr. Condon donated to, and turned back into the treasury of the company, 1,000,000 of its shares, to be used in the acquisition of other properties, and possibly also for development. Prior to the

location of the Portland and Bobtail No. 2, other locations had been made which covered nearly all of the ground embraced within the exterior boundaries of these two claims. Among these were the Anna Lee, Doubtful, Scranton, Queen of the Hills, Vanadium, Hidden Treasure, Captain and White House. A subsequent conflicting location was the Baby Ruth. The plaintiff owned an interest in the Queen of the Hills, Hidden Treasure, Vanadium and Baby Ruth. Only about one sixth of an acre of the Portland mine, in which alone of the two claims mineral had been discovered, was free from conflict with some of the claims mentioned, and at the time of the occurrences hereinafter mentioned, the company was enjoined from working this. Between these conflicting claims and the Portland Company, a large number of adverse suits, some fifteen or twenty, were pending in court, besides a large number of other suits asking injunctive and other relief. Early in April, 1894, defendant Stratton, individually and upon his own account, purchased the Scranton claim, one of the principal claims which conflicted with the defendant company, for $30,000, and also for the sum of $12,000 purchased a lease upon one of the other claims and a segregated portion of the Hidden Treasure claim. At this time, the four individual defendants and one Horace K. Devereux constituted the board of directors of the Portland Company. The company was then without a dollar in its treasury, with no credit, and its stock of no market value,— in fact of no value, except a mere speculative one. About this time also, to further the interests of the company, and assist in relieving it from the difficulties in which it was involved, Mr. Stratton and Mr. Devereux turned into the treasury of the company of their own individual holdings, 600,000 shares, to be used with that which had previously been turned in for the purpose of settling the litigation of the company and acquiring conflicting properties. Such was the condition of affairs in April, 1894, when the defendants Burns, Harnan, Doyle and Stratton entered into negotiations with the plaintiff and his associates, owners of the

Queen of the Hills, the Hidden Treasure, the Vanadium and the Baby Ruth lode claims, for the outright purchase thereof. This culminated in a contract of purchase and sale, and on April 16, 1894, the plaintiff and associate owners of these claims executed and delivered a deed conveying the claims to the four individual defendants. At the same time, the following so-called agreement, in writing, was prepared at the suggestion of plaintiff, and signed by all parties, purchasers and sellers.

"This agreement made and entered into this 10th day of April, A. D. 1894, by and between Charles J. Cover, W. L. Fyffe, H. L. Pigg, A. P. Mackey, L. W. England and W. S. Montgomery, parties of the first part, and W. S. Stratton, James F. Burns, John Harnan and James Doyle, parties of the second part.

"Witnesseth, That the said parties of the first part agree to forthwith convey to the said parties of the second part, the Queen of the Hills lode mining claim, the Hidden Treasure lode mining claim and the Baby Ruth lode mining claim situate in El Paso county, state of Colorado; in consideration whereof said parties of the second part agree to pay to the said parties of the first part for said premises $21,000, in cash, executing notes in the sum of fifteen thousand dollars, due August 1, 1894, and further agree that within five days from the date hereof, they will deliver to said parties of the first part one hundred and fifty thousand shares of the capital stock of the Portland Gold Mining Company, as follows:

"Charles J. Cover, 26,409 shares; W. L. Fyffe, 26,408 shares; H. L. Pigg, 22,183 shares; A. P. Mackey, 37,500 shares; L. W. England 18,750 shares and W. S. Montgomery 18,750 shares.

"And said parties of the second part further agree that within five days from the date hereof, they will cause to be conveyed to the Portland Gold Mining Company all the mining claims herein to be conveyed to the parties of the second part; also the Scranton lode mining claim, situated in El Paso county, state of Colorado."

It will be observed that this agreement embraced the Scranton claim theretofore purchased by Stratton, individually, and in which plaintiff and his associates never had any interest.

On the following day, April 17th, a meeting of the directors of the Portland Company was held, at which all were present. At this meeting, there was considered terms upon which these individual defendants should convey the property which they had purchased to the defendant company. The company having nothing which it could give in exchange, except stock, that was the only question which seems to have been considered. Various suggestions were made as to the price at which the stock should be taken by the parties, the highest being that suggested by Mr. Stratton, namely eight cents per share. Mr. Devereux, however, who was not interested in the original purchase, and who, it is claimed, represented the absent stockholders, who were only few in number, finally suggested that if the parties would take the stock at twelve and one half cents per share, it would be satisfactory to him and the other stockholders. This was agreed to, and thereupon, upon motion of Mr. Devereux, a resolution was unanimously adopted, providing for the issuance to the four individual defendants of 704,000 shares of stock in lieu of cash paid for the property purchased by the four individual defendants, as evidenced by the agreement above referred to, together with the Scranton lode and the other individual holdings of Stratton, to which we have also referred; and also the issuance of 150,000 shares of stock, which they had agreed to give to the plaintiff and his associates, in part payment for the property purchased from and conveyed by them. Thereupon, the four defendants conveyed the property to the defendant corporation, and thereafter, and subsequently, the stock provided for in the resolution was issued to them, except that the 150,000 shares of stock to be given to the plaintiff and his associates was issued on April 19th directly to them, instead of being first issued to the four individual defendants and being by them transferred. The plaintiff challenges the legality of so much of this transaction as di-

rected the issuance of 704,000 shares to the individual defendants, and brings this suit to compel them to transfer and replace into the treasury of the company all of said shares, also that an account be taken of the amount of dividends which had been paid to the defendants on account of said shares, and to compel the payment to plaintiff of the amount of such dividends that were properly due to him, also asking for a temporary injunction restraining said defendants from selling or disposing of or incumbering the said shares of stock so received by them, and also restraining them from receiving, and the defendant company from paying, any dividends on said 704,000 shares of stock.

Additional pertinent facts will be referred to during the course of this opinion.

Judgment was for defendants, and plaintiff appeals.

Counsel for plaintiff very properly summarize their objections and their position as follows:

1. That the act complained of was wholly unauthorized and void.

2. That it was fraudulent as to the shareholders of the Portland Gold Mining Company.

3. That if neither of these positions be correct, the plaintiff is still entitled to recover, because they claim the evidence of the individual defendants shows that they bought the company's assets out of which they made immense profits, and that consequently they must account to the shareholders for all accrued benefits and profits.

The plaintiff acquired the right to maintain this suit on behalf of himself and other shareholders similarly situated solely by reason of the fact that, after previous demand, the corporation itself, failed or refused to institute the suit. The Portland Gold Mining Company, therefore, though nominally a defendant, should be considered and treated as in reality the plaintiff. The plaintiff can have no rights except such as the corporation would have.

In the briefs of counsel on both sides, considerable space is devoted to the discussion of the question as to the relation

which directors bear to the shareholders of a corporation, and the corporation itself. In the view which we take of this case, it is not necessary for this court to enter into the discussion. It is sufficient to say that it is universally conceded the relation is a fiduciary one; that the directors are, in some sense at least, trustees for the stockholders, and that their conduct with reference to and dealings with the corporate property is subject to the closest and strictest scrutiny. They occupy a position of the highest trust and confidence, and the utmost good faith is required in the exercise of the powers conferred upon them. The law governing the obligations of fiduciaries is applicable to them.

The first question which presents itself is that plaintiff seeks to nullify and rescind only a part of the contract. He nowhere asks that the entire contract be rescinded, and that the *status quo* be restored. He seeks only to have the individual defendants compelled to restore to the corporation the shares of stock which they received in payment for the mining property conveyed, but does not offer to reconvey that portion of the stock which he received, nor that his associates be compelled to restore the portion of stock which they received as a part of the same identical contract and transaction by which the defendants received their stock. It is a well settled principle of law, needing no citation of authorities in its support, that courts of equity will not permit such a course of procedure. The general rule, sustained by all authorities, is, that if a rescission is asked for and granted, it must be of the entire contract, and not of any part thereof, and the relegation of the parties to their original rights in respect to the subject-matter. It would seem clear, both in principle and upon authority, that the plaintiff could not ask the court to sustain that part of the contract only which was beneficial to himself, and repudiate that part which is not so beneficial, and this, too, without requesting that the defendants be restored to their original rights in respect to the property. However objectionable the complaint and proceeding may be in this respect, we prefer to base our decision upon broader ground.

Conceding, which we do not, it to be the inflexible rule in all cases and under all circumstances, that all contracts for the purchase of the property of a corporation by the directors are absolutely void *ab initio*, as seems to be contended by counsel in their first objection, the facts would not appear to bring this case strictly within the rule. The stock in question was not strictly treasury stock, as the term is used by the books and is generally understood in business transactions. It was not reserved from the capital stock of the company at its organization as the property or assets of the corporation and thereby of the entire body of the stockholders, to be used for specific purposes designated in the articles of incorporation or in the by-laws of the company. It was stock which had been issued as full paid up, for value received, to the various shareholders of the association, and was by these shareholders subsequently donated to the company for the specific and identical purpose for which it was afterwards used. It was, in effect, an asset of the company, which it could dispose of as any other property constituting an asset could be sold or exchanged for other property which the corporation might have the power to acquire or hold. It was the same kind of an asset as would have been money, if there had been any in the treasury. Under the circumstances of this case, clearly appearing by the great weight of the testimony, we think the transaction complained of was similar in principle to that which allows a director, in the absence of fraud, to advance or loan money to a corporation, and as such creditor to enforce against the corporation all the rights that any other creditor would have. This has been very generally upheld, but we need cite authority only from this court, where the doctrine has been fully discussed. *West v. Hanson Produce Co.*, 6 Colo. App. 467 ; *Mining Co. et al. v. Bank*, 10 Colo. App. 339. At the time of this transaction, the corporation was deeply involved in litigation,—a large number of adverse suits being then pending against it by senior locations involving practically the entire territory claimed by the company. The corporation had no money in its treasury;

no credit by which it could raise money ; its stock no market value, and, in fact, no value at all except a purely speculative one.    That the acts complained of were highly beneficial to the company, and to each and every one of its shareholders, and were, in fact, the salvation of the company, cannot be for an instant disputed or questioned.    It therefore comes with ill grace from one who has been so materially benefited by the transaction to complain, and courts of equity will not listen with much satisfaction to such complaints.    *Gas Co. v. Berry*, 113 U. S. 327.    They will not set aside such transactions upon any slight showing.

The rule, however, does not go to the extent that all purchases of property or the assets of a corporation by a director or directors are absolutely void, and counsel for plaintiff admit it, when they say, as they do in their brief, that " the only justification which the courts permit to be urged is that the stockholders, upon the clearest understanding of all the facts, gave their authority for it; or that, upon the same full and complete understanding of all the facts, they ratified it."    It is upon this ground that we prefer to and have no hesitancy in basing our opinion, whatever may be the conflicting views, if there be any conflicting, as to the legal principles to which we have already adverted.    On the 17th of April, 1894, when the transaction of purchase and sale or exchange between the individual defendants and the corporation was agreed upon and consummated, there were only four shareholders in the company, aside from the five directors.    It is undisputed from the evidence, that when these individual defendants had finally paid off the notes which they had executed for a part of the purchase price of the properties conveyed to the corporation, and received all the shares of stock to which they were entitled under the resolution of April 17th, they notified each one of the shareholders that they might share in this stock, so issued to them for the payment of the purchased properties, in proportion to their holdings of stock in the company, upon the payment by each one of them of the sum of twelve and one half cents per share, being the same amount

at which the defendants had received the stock, in order to repay them for the sums of money which they had advanced, and each one of the stockholders, except Mr. Devereux, accepted and complied with the proposition. This, too, was after the stock of the company, solely through the instrumentality of these individual defendants, by the transaction which the plaintiff here assails, had appreciated, having a market value of more than twelve and one half cents per share, clearly showing the entire absence of any fraud upon the part of said defendants. This was a ratification by the stockholders of the entire transaction, as full and complete as if they had been convened in regular meeting and had adopted a formal resolution to that effect, and placed the same upon record, and had the same effect as if these stockholders had originally participated in and expressly authorized the exchange of the stock for the property. Mr. Devereux did not accept the proposition, but not for the reason that he disputed or contested the legality of the transaction. He, it was, as a member of the board of directors, who fixed the value at which the stock should be taken by the individual defendants in exchange for the property purchased by them, and it was upon his motion that the purchase and exchange was made. His ratification, therefore, of the deal is a matter of record. The plaintiff was not a shareholder of the company, and did not become such until April 19—two days subsequent to the consummation of the contract and sale, of which he here seeks to complain. It is true, that the resolution of April 17, it being part of the contract between these individual defendants and the corporation, provided that the 150,000 shares of stock which they had individually agreed to deliver to the plaintiff and his associates, as a part of the purchase price of the properties sold by them, should be issued by the corporation. This, however, did not make the plaintiff nor his associates shareholders, nor did they become such until the stock was actually issued to them. Their contract was solely with these individual defendants, and so was the contract by the corporation. There was no contract

whatever between the plaintiff and his associates, nor any of them, and the corporation. What the corporation did on April 17, so far as the 150,000 shares of stock was concerned, was simply an agreement with these individual defendants to recognize a personal obligation of theirs, and to issue the stock with which they might fulfill it. It was a part of the purchase price being paid by the corporation to the individual defendants who held the title to and were conveying the property. It could not for a moment be considered, either in reason or principle, in law or in equity, that such action immediately, or at all, invested the plaintiff and his associates with all, or any, of the rights and privileges of shareholders, nor could they become such until consummation by the transfer or·issuance to them of the stock. The corporation might, under the express terms of the resolution, have issued it direct to the four individual defendants, leaving them to deliver it in fulfillment of their personal obligations, or not deliver it, as they might see fit. Certainly, it could not be claimed in such case that the plaintiff would have had any action against the corporation, yet if the contention of the plaintiff is correct, this would have been the case.

The contract being virtually between the body of the stockholders and the four individual directors, as we have held, in whatever aspect it may be viewed, the views which we have expressed are not in conflict, but in entire accord, with the principles laid down in a very recent, able and exhaustive decision of our supreme court. *Morgan, Admr., et al. v. King,* 27 Colo. 539; 63 Pac. Rep. 416.

It is strenuously insisted by plaintiff, that when the individual defendants purchased the property from him and his associates, they did so as trustees for the Portland Company, and that they held the property in trust for it and its shareholders. We cannot view this in any other light but as a question of fact, and the great weight of the evidence, circumstantial and otherwise, is to the contrary. It is true, the purchasers stated openly that they expected and intended

to convey the property to the Portland Company, but this alone could not make them trustees, and it would be a most unreasonable assumption that they intended, or expected, to so convey without any consideration whatever from the Portland Company, after having advanced and obligated themselves to pay for said property $88,000 in money and 150,000 shares of Portland stock. The fact that they bound themselves in a written agreement to convey the property within five days in nowise militates against this conclusion. This was inserted at the request of plaintiff and his associates simply in furtherance of their interests. They naturally and properly desired that the properties conveyed by them, and also the Scranton claim, in which they had never had any interest, should be incorporated with those of the Portland Company, so as to make their stock, which they were to receive from the purchasers, of increased, or at least of some, value. Under no reasonable presumption or rule of construction can it be said that this stipulation had any reference to, or bearing upon, the consideration which the Portland Company was to pay to these defendants for the properties, or upon any contract of purchase and sale or exchange which might be entered into between said company and said defendants.

Plaintiff contends that when he and his associates parted with their title, they parted with it to the defendant corporation, and that they became equitable share owners in the corporation the moment they signed, sealed and delivered the deed. We do not see how such a proposition can be maintained, either on reason or authority. They parted with their title to the individual defendants, the corporation not being a party to it in any sense of the word. Even if it be said that the defendants, by virtue of the contract of sale executed between them and plaintiff and his associates, bought and became trustees for the corporation so far as they could so voluntarily constitute themselves, it still could not be successfully contended that the sellers became thereby and thereupon equitable share owners. The reason

is, that the corporation was not a party to the contract. It might have accepted or repudiated the transaction. In the latter case, plaintiff and his associates could by no possibility have compelled the corporation to accept. They would have had no cause of action whatever against it. Neither can it be said that the plaintiff became an equitable share owner upon the adoption of the resolution on April 17. That resolution did not recognize him nor his associates, either in terms or by implication. The corporation was dealing solely with the four individual defendants in whom the absolute title to the property was vested, and had no concern with the personal obligations which the said defendants had assumed to secure such title. The resolution authorized the president and secretary of the company to purchase the mining claims in question "from the present owners," who at this time, it is undisputed, were the individual defendants, and to issue in payment thereof "treasury stock to the amount of 704,000 shares, in lieu of cash paid, and 150,000 shares of stock given in payment of said properties." The owners of the title alone were recognized. The 150,000 shares of stock, as well as the other shares issued in lieu of cash, were, by virtue of the resolution, to have been issued to them. If subsequently, for convenience in the sale or transfer, or at the direction of the defendants, the shares of stock were issued directly to the plaintiff and his associates, instead of going first to the defendants and being transferred by them to the plaintiff and his associates, it can in no manner affect or bear upon the plaintiff's right as a shareholder, nor place him in any better or different attitude towards the corporation than if the stock had been first issued to the defendants and by them transferred. It is quite clear, therefore, that plaintiff, at the time of the transaction complained of, was neither equitably nor legally a shareholder, and he cannot be heard to complain of it. Corporate acts which may be lawfully done, and are done, by the consent or authority of all the then stockholders cannot be questioned by

one who afterwards becomes a share owner. In a private corporation, the entire body of stockholders is the owner of its assets and property, and it has the same general right as an individual to do as it pleases with it, subject only to the rights of creditors, unless possibly there be some restriction upon this right in the statutes under which the corporation is organized, or in its articles of incorporation. If the doctrine be once admitted, as contended for by plaintiff, it would tend to produce unending confusion. A shareholder would never be enabled to definitely know or ascertain what his rights were, nor the value nor extent of his interest in the corporation, and the corporation would be at all times subject, without any means of escape, to a multitude of vexatious suits ; its business affairs could never be definitely settled and its business transactions never ended.

There was considerable evidence tending to show a ratification by plaintiff of the act which he now assails, and also of laches on his part which would equitably estop him from maintaining or from recovery in this suit, and counsel argued them with much force. For the reason that the questions which we have already considered are, in our opinion, fully decisive of the case, we do not deem it necessary to discuss these.

It appears to us conclusively that the transaction was without the slightest taint of fraud or wrongdoing; that the act of the four individual defendants and of the entire board of directors was not only for the benefit of The Portland Gold Mining Company, and each stockholder therein, but by this act the company was rescued from its failing fortunes, and enabled thereby to acquire, and make its properties valuable, yielding large profits to its stockholders, which there is every presumption they could not otherwise have received. It appears, too, that whatever doubts there might have been in the first instance, as to the strict legality of the action of the individual defendants, and of the board of directors, were entirely removed by the ratification, consent

and approval of each one of the then individual stockholders. The legal effect of this was to render the transaction unassailable.

For the reasons given, the judgment will be affirmed.

*Affirmed.*