No. 15,121.

KULLGREN ET AL. *v.* NAVY GAS AND SUPPLY COMPANY ET AL.

(135 P. [2d] 1007)

Decided March 15, 1943. Rehearing denied April 5, 1943.

Mr. WILLIAM E. SCOFIELD, Mr. ROBERT L. McDOUGAL, Mr. EARLE F. WINGREN, Mr. BYRON G. ROGERS, for plaintiffs in error.

Messrs. VAN CISE, ROBINSON & CHARLTON, Mr. STEWART A. SHAFER, for defendants in error.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

A SUIT by plaintiff in error Kullgren, a minority stockholder, to void a voting trust agreement in relation to stock in defendant in error Navy company, to restrain defendant in error Thomas from exercising voting rights thereunder, to restrain the directors of the Navy company from issuing eighteen shares of stock of that company to defendant in error Moffitt in exchange for fifty shares in defendant in error Grand company, and to restrain the abolishment of cumulative voting. Originally, Kelly, Ingersoll and Gorden, the other plaintiffs in error, were defendants, but at their first appearance in the suit they made common cause with plaintiff Kullgren, and thenceforth were regarded as having like status. Their holdings in the Navy company, plus those of Kullgren, exceed, and at all times important to our inquiry have exceeded, the total of the holdings of all other stockholders in that company. Other than as to the abolishment of cumulative voting, restrained below, judgment was adverse to the suit.

Preliminary to examination of the record otherwise, it is informing to state that the relief which finally was denied below, was denied there earlier when a temporary restraining order was sought. February 20, 1942, application to that end having been made here in the matter, we entered a temporary restraining order for the purposes prayed, to continue until our further order.

June 11, 1942, we modified the order so that the directors of the Navy company, proceeding before August 5, 1942, the expiration date of the voting trust, and on their theory that they had authority in the premises, might hold a directors' meeting for the purpose of acting on the proposition of Moffitt to exchange fifty shares of Grand company stock for eighteen shares of the Navy company, subject, as before, to our further consideration and order. In furtherance of our active control in the premises, an added condition was, that if the directors acted pursuant to such permission, and favorably to the proposal, any certificate of stock issued to Moffitt, together with a certified copy of the minutes of the meeting of directors, and of the stockholders, if one were held, were to be deposited with our clerk.

June 15, 1942, proceeding pursuant to leave in the circumstances stated, a meeting of the directors of the Navy company was held, and at such meeting a resolution was passed by the votes of directors Thomas, Kennedy and Dorsey (of defendants in error), director Mullin (of plaintiffs in error) voting contra, to the effect that the Navy company issue to Moffitt eighteen shares of its treasury stock in exchange for fifty shares owned by him in the Grand company. Deposit of the certificate and minutes was made as per our order. July 17, 1942, a meeting of the stockholders of the Navy company was held, the purpose being, as announced by defendant in error Thomas, president of the company (although he and the other proponents urged then, as throughout they have insisted, power to that end was vested in the directors), to pass upon the exchange of stock previously made by the board of directors of the Navy company, as already outlined. At the stockholders' meeting, all, except Kelly, represented by proxy, were present in person. Thomas, assuming to act on authority of the voting trust, ruled that personally the stockholders held for voting purposes, shares as follows: Dorsey 1, Gorden 1, Ingersoll 1, Kelly 1, Kennedy 1, Kullgren

22, Mullin 1, Thomas 33, or 61 shares, and that he, as voting trustee, for the like purpose, represented the remaining shares of stockholders as follows: Dorsey 8, Gorden 21, Kelly 32, Kennedy 32, Mullin and Ingersoll 3, or 96, making a grand total of 157 shares. Also, subject to our final decision, Thomas, holding Moffitt's proxy, ruled that he could vote the eighteen shares issued to Moffitt in manner stated. Kelly, by his proxy, enjoying the support of all Navy stockholders other than Dorsey, Kennedy and Thomas, objected to the procedure being followed by Thomas, challenged his authority to represent other than himself on the question presented, and demanded to the effect that all stockholders (the objecting ones in particular) be permitted to vote their own shares of stock, that is to say: Kelly 33, Dorsey 9, Gorden 22, Ingersoll 1, Kennedy 33, Kullgren 22, Mullin 1, Ingersoll and Mullin 3, Thomas 33, or 157 shares, and that the exchange of stock with Moffitt be not approved by the stockholders, the objection being variously set forth. On the theory that Thomas, as trustee, the owners of a majority of the shares of the Navy company present and objecting notwithstanding, had power to that end, the exchange was approved by a vote of 131 to 26, or, assuming the legality of the Moffitt issue, 149 to 26. On the basis of stockholders voting their own stock on the question (the eighteen shares issued to Moffitt disregarded), the vote was 75 shares in favor thereof, as follows: Thomas 33, Kennedy 33, Dorsey 9, and 82 shares against it, as follows: Kelly 33, Gorden 22, Ingersoll 1, Kullgren 22, Mullin 1, Ingersoll and Mullin 3. A certified copy of the minutes of the foregoing stockholders' meeting was deposited here. It is noted that until the occasion just discussed, Thomas had never employed the voting trust other than to elect directors of the Navy company, and at no time, apparently, had it been necessary for him to use it even for that purpose.

Before it became necessary for the court to consider

or enter orders in the suit of Kullgren, a minority stockholder, it became a suit by majority stockholders, as we have seen, all joining in Kullgren's claim that the Navy directors were without authority to exchange treasury stock of the Navy company for Grand company stock privately owned, as threatened, and on further predicate, Kullgren joining the others therein, that, regardless of the claimed authority under which the directors fain would proceed, the majority holders of shares of Navy company stock, declaring in that capacity by formal writing admitted in evidence as an exhibit, and by oral testimony at the trial, to the knowledge of all stockholders and directors of that company, and months before the attempted consummation of such exchange of stock, had voiced their opposition thereto and renounced it.

Earlier history is, that, December 9, 1931, the stockholders authorized the directors to purchase nineteen shares of its stock previously issued, at $5,000 per share, or $95,000, and "to hold the same in the treasury subject to such sale or other disposition of said stock so purchased, or any portion thereof, as you may hereafter determine." The purchase was concluded at the price mentioned, $20,000 of funds in hand and $75,000 borrowed from a bank being employed in the matter. To secure the bank loan all the remaining stockholders (all except Moffitt being those here) pledged their individual stock as well as the newly acquired nineteen shares. In 1936, the bank having been fully paid, all pledged stock was surrendered. The nineteen shares were place in the Navy company treasury. The eighteen shares involved in the questioned issue to Moffitt are of the nineteen shares.

The Grand company, fifty shares of which Moffitt proposes to exchange for eighteen shares of the Navy company, has a total stock issue of one hundred eighteen shares, sixty-eight shares of which the Navy company owned prior to the attempted acquisition of the addi-

tional fifty shares involved, and continues to own them. Thomas is president of the Grand company, and, other than Moffitt, a director thereof, the directorate of that company is of the directors of the Navy company.

From the time of the purchase of the nineteen shares by the company, although prior thereto the Navy company had paid dividends, and until the bank loan of $75,000 had been discharged, accomplished in 1936, none was paid. A dividend was paid in 1937, but none has been paid since. Expressed otherwise, prior to 1931, on a stock issue of thirty-six shares the Navy company paid dividends, but since then, excepting only 1937, with a stock issue reduced by more than one-half, a reduction accomplished at a cost of $5,588.23, plus, per share to the holders of the remaining seventeen shares, no dividends have been paid. During all those years, however, substantial salaries were paid to the several stockholders, as employees, in sums, in all recent years shown to be as follows: Thomas, as president, $700 per month, plus car allowance of $50 per month; Kelly, $450 per month, plus car allowance; Kennedy, $427 per month, plus car allowance; Dorsey, $200 per month, plus car allowance; Mullin, $200 per month; Gorden, $135 per month. Until Kullgren opposed the voting trust executed in 1939, he received a salary, but thereafter was discharged by Thomas. Moffitt, also employed by authority of Thomas, worked for both companies as Thomas directed and was paid a monthly salary of $325.

Thomas has been a director and president of the Navy company since 1929, and since 1931, proceeding by the authority of the stockholders' voting trust, already mentioned, periodically renewed, he chose the directors of the company, who, by authority of a company bylaw, elected the officers (always choosing Thomas as president) and fixed the president's salary, and Thomas, as president, fixed the salaries of all other officers. Their salaries, however, were enjoyed by virtue of company employment, not as officers, and the fact of their em-

ployment, as well as the tenure thereof, was dependent upon the favor of the president, a power which in instances he exercised adversely to some of them—always those who opposed his management.

The original voting trust, as well as its several renewals, provided, substantially, that Thomas, as trustee, should vote the stock "at any and all meetings, general or special, of the stockholders of said corporation whenever and wherever held, as he may determine to be for the best interests of the corporation."

That the apparent increased share holdings of stockholders may be understood, it should be stated that in 1940 stock certificates were arbitrarily increased by ten shares for each share then outstanding. To illustrate: Thomas' certificate for three shares was increased to thirty-three shares, and Kullgren's from two shares to twenty-two shares. Proportions were not disturbed.

It is clear that since 1931—1937 excepted—only the president of the company, the principal beneficiary, and other stockholders employed on salary, have benefitted from the company's activities. It is also clear that before and at the time the directors of the company undertook to issue eighteen shares of the company stock to Moffitt in manner stated, the president of the company and his supporters of the directorate were opposed by the holders of a majority of the shares of stock outstanding, and other control and consequent change of personnel of pay roll impended. It is quite as clear, the situation fairly appraised, that by the proposed Moffitt stock exchange, and only so, those who otherwise were about to be separated from profitable employment, would become reestablished as dominant holders. With these evident considerations in mind, we give attention to the question of whether the majority of the directors, that is to say, Thomas, Kennedy and Dorsey, proceeding in the Moffitt stock exchange matter, acted in their own interest rather than in that of the company, and, if so, whether such action was permissible.

The relation which directors bear to the stockholders of a corporation, and the corporation itself, as "universally conceded * * * is a fiduciary one;" and "The law governing the obligations of fiduciaries is applicable to them." *Mackey v. Burns,* 16 Colo. App. 6, 64 Pac. 485. "A director of a corporation is in the position of a fiduciary; that is a principle deeply rooted in our law. He owes loyalty and allegiance to his corporation, a loyalty that is undivided and an allegiance that is influenced in action by no consideration other than the welfare of his corporation. He is held 'in official action, to the extreme measure of candor, unselfishness and good faith. Those principles are rigid, essential and salutary'." *Turner v. American Metal Co.,* 36 N.Y.S. (2d) 356, 369. "The directors of a corporation act in a strictly fiduciary capacity. Their office is one of trust and they are held to the high standard of duty required of trustees. * * * Corporate directors cannot manipulate the property, of which they have control in a trust relation, primarily with the intent to secure a majority of the stock or of directors in any particular interest. This is not a fair exercise in good faith of the power with which they are clothed. * * * This is especially true when the issuance of the stock is for the express purpose of retaining in power the very persons who authorize the issue, and who are therefore distinctly benefited to the disadvantage of another and substantial part of their stockholders." *Elliott v. Baker,* 194 Mass. 518, 80 N.E. 450. "No rule is better established than that the directors of a corporation stand in the position of trustees for the entire body of stockholders, and while stock owned by the director is his individual property to be dealt with as he sees fit in the same manner and to the same extent as other stockholders, yet, when he acts in his official position, he is acting not merely as an individual but as representative of others and is prohibited from taking advantage of his position for his personal profit or to reap personal benefit to the detriment of

462

the stockholders whom he represents. Whenever there is an intimation that a director has violated the duty thus imposed upon him by virtue of his office, or has failed to act fairly and honestly toward those whom he represents, the law ceases to look at the mere form of the device or means employed, and 'pierces through the surface and seizes upon the evils which lie within'." *Glenn v. Kittanning Brewing Co.*, 259 Pa. St. 510, 103 Atl. 340. "The directors of a corporation stand in fiduciary relations to it and to its stockholders. They are trustees. They are held to the exercise of the utmost good faith. It is commonly stated in the cases that they are the trustees and the corporation and stockholders are the cestuis que trustent. They manage the corporation for the benefit of the stockholders. Holders of the majority of the stock have a right to control the corporation. It is a fraud for the directors or a majority of them to take advantage of a temporary ascendency in the board of directors to so manipulate the sale and issue of stock as to oust the control from the majority of the stockholders, and secure it to themselves, and equity will afford relief." *Trask v. Chase*, 107 Me. 137, 77 Atl. 698.

When we consider that in 1931 the Navy company, then having outstanding only thirty-six shares, seventeen shares of which were owned by those here other than Moffitt, bought the other nineteen shares at a cost of $95,000, and placed them in the company treasury, we cannot think the act of the directors in attempting to exchange eighteen of those shares for fifty shares of another company, a company in which the Navy company not only already owns a preponderating majority of its entire stock issue, but whose presidency, directorate and management were identical with those of the Navy company, can find legitimate predicate in the claim that such exchange is in the interest of the Navy company and its stockholders as such. If the act does not rest on that base, then it is without foundation. We

have not overlooked the letter signed by the stockholders in 1931, whereby the directors were authorized to purchase the nineteen shares and hold them in the treasury "for sale or other disposition" as the directors might thereafter determine. "Even then, however," as the Wisconsin Supreme Court has said in a case not dissimilar, "their duties with reference thereto are fiduciary; they are bound to act uberrima fides for all stockholders. To dispose of or manage property of the corporation to the end and for the purpose of giving to one part of their cestuis que trustent a benefit and advantage over, or at the expense of, another part, is breach of such duty, especially when the directors themselves belong to the specially benefited class." *Luther v. Luther Co.,* 118 Wis. 112, 123, 94 N.W. 69. Here, as indubitably appears, Thomas, Kennedy and Dorsey, presently constituting a majority of the board of directors of a company that for several years had not paid dividends, but from which, due to their control, they enjoyed the considerable salaries already stated, having become aware that they no longer enjoyed the confidence of the holders of a majority of the stock, and desiring, naturally, to avoid enforced separation from what was no mean employment, seized upon the general language of an old letter as authority to transfer eighteen shares of the Navy company in such manner that the purpose of the majority of present stockholders would be circumvented, and their own interests served.

First of all, we do not regard as sound the claim that only by procuring the additional fifty shares of the Grand company can the Navy company work savings in operating expenses. It is reasonable to conclude, we think, that the Navy company's present major stock control of the other company and domination of its directorate and officiary, ought to enable it to effectuate any desired economy. Present management's admitted inability to do so, may well have been a contributing cause to the majority stock opposition to those in con-

trol. Besides, by issuance of the eighteen shares the holdings of the present stockholders, enhanced in value by more than fifty per cent when nineteen shares out of a total issue of only thirty-six shares were purchased by the company at a cost of $95,000, or $5,000 per share, to the holders of the remaining seventeen shares, identical with present personnel of ownership, it is grossly unfair, we think, that eighteen of those shares costing $90,000, should be exchanged for fifty shares of stock in a company already owned, managed and controlled by the Navy company.

Secondly, since the basis of the claim that the directors of the Navy company had authority to exchange eighteen shares of that company for fifty shares of the Grand company, is the letter of December, 1931, already sufficiently stated, a pertinent inquiry is, Does the general language of the letter of authority constitute irrevocable powers? We are not of that view. Eleven years have elapsed since the stockholders wrote the letter. During the more than a decade that the shares in question have belonged to the company, they were carried on its books neither as an asset nor as a liability. There was no consideration moving from the directors to the stockholders when the letter was written. At no time have the directors done anything to their hurt on the faith of the letter. Indeed, other than as an agency of the stockholders in the premises, acting without material interest, any separable thing which the directors might have done pursuant to the letter, but had not consummated, was subject to withdrawal at the pleasure of the stockholders, as we think may not be gainsaid. On the authority of the letter of the stockholders the directors purchased the shares as directed, as we have seen, but before they had made disposition thereof, and prior to interest of any third party attaching, the stockholders, proceeding not less formally than when granting it, revoked the authority to the knowledge of all concerned.

■ From the time the suit became one by majority stockholders, rather than by a minority, as at its institution, the power of the directors to transfer shares of Navy company stock in exchange for shares of Grand company stock, threatened in the circumstances appearing, and the power of Thomas, acting as voting trustee, to control stockholder consideration thereof, became the prime questions, and, if resolved adversely to such claims of authority, as we think must be the determination, the other questions involved, largely administrative, may well have attention of the authority born of the new stock control. The trial court absolved the directors, including Thomas, and Thomas as trustee, from venality, with which we are not disposed to disagree. But that is not involved in the question of their right, proceeding under the authority exhibited, to exercise the power they have undertaken in relation to disposing of Navy company treasury stock. "The honesty of purpose of the defendants is not a decisive test of the propriety of their conduct. The right of the plaintiffs to prevent an issue of stock by the defendants * * * for their own gain does not rest on fraud but on the fiduciary duty of the directors. A necessary and obvious consequence of the issuance of the nineteen additional shares * * * would have resulted in destroying the equality of stock ownership which had obtained since the organization of the corporation. It is settled that the directors of a corporation cannot lawfully issue treasury stock * * * for the purpose of gaining control of the corporation without giving the other stockholders an opportunity to subscribe." *Fosgate Co. v. Boston Market Terminal Co.,* 275 Mass. 99, 175 N.E. 86. We are constrained to observe that the court's sweeping statement, that, proceeding under the voting trust agreement, Thomas "can vote to throw the corporation in the ash can if he wants to," does not conform to our appraisal of the authority of a trustee.

Reduced to its simplest terms, the question is, Which

of the groups of contending stockholders is entitled to prevail? The record, stripped of all diverting circumstances, persuades us that in share holdings plaintiffs in error are predominant. It conforms to the philosophy of free government, therefore, and the justice which such a government guarantees and protects, to determine that plaintiffs in error may not equitably be denied the rights and privileges due those whose chorus swells from preponderating voices. Our temporary restraining order is made permanent.

The judgment for costs against plaintiffs in error, ordered below, is reversed, and for convenience of attention in that regard the cause will be remanded to the trial court, where judgment against defendants in error for costs is directed to be entered.