588 P.2d 380 (1978)
GREAT WESTERN UNITED CORPORATION, Plaintiff-Appellee,
v.
GREAT WESTERN PRODUCERS CO-OPERATIVE, Defendant-Appellant.
No. 77-565.
Colorado Court of Appeals, Div. III.
September 28, 1978.
Rehearing Denied October 19, 1978.
Certiorari Granted December 26, 1978.
Ireland, Stapleton, Pryor & Holmes, P. C., Hardin Holmes, Kenneth L. Starr, Michael Touff, Denver, Shank, Irwin, Conant, Williamson & Grevelle, Ivan Irwin, Jr., A. B. Conant, Jr., Robert B. Cousins, Jr., Dallas, Tex., for plaintiff-appellee.
Williams & Connolly, Jeremiah C. Collins, John W. Vardaman, Jr., Pierce O'Donnell, Washington, D. C., White & Steele, P. C., Walter A. Steele, James D. Hinga, Denver, for defendant-appellant.
VanCISE, Judge.
In May 1975, plaintiff Great Western United Corporation (United) filed this action *381 for a determination that the agreement for the sale of all of the stock of United's wholly owned subsidiary, the Great Western Sugar Company (Sugar Company), to the defendant Great Western Producers Co-Operative (Co-Operative) had been terminated and abandoned. The Co-Operative denied generally, and, as pertinent here, counterclaimed for damages for breach of United's contractual obligation to use "best efforts" to obtain approval of the sale by its security holders. At trial, the jury held against the Co-Operative on its counterclaim. The court entered judgment dismissing the counterclaim and declaring that the agreement was terminated. We affirm.
There is virtually no dispute as to the facts in this case. United was a holding company, whose principal asset was the Sugar Company. In 1971 the board of directors of United first considered the sale of the Sugar Company as part of a plan of recapitalization. The Co-Operative was formed by sugar beet producers in a seven state area for the purpose of purchasing the Sugar Company. After protracted negotiations, the purchase agreement (the contract) involved in this lawsuit was signed in March of 1974. The Co-Operative agreed to purchase and United to sell all of the outstanding stock of the Sugar Company for a price estimated at $43,500,000 subject to adjustments as spelled out in the contract. Cash amounting to $500,000 was paid as a deposit with the balance to be paid in the form of notes and debentures to be issued by the Co-Operative shortly after closing.
Because the Sugar Company stock was the major asset of United, the sale had to be approved by United's shareholders and debentureholders. The contract provided that "United will use its best efforts to obtain the approval of its shareholders and debentureholders," and that, if these security holders approved the sale, the required documents would be executed by United on or before the October 1 closing date. The "best efforts" clause is the main subject of this appeal.
After the contract was signed, the price of sugar increased significantly, starting in May and continuing through the summer and fall. The escalating price resulted in record high profits for the Sugar Company and a corresponding increase in its value.
The vote on the sale was scheduled for the annual meeting in late September. On August 28, United distributed a 300 page proxy statement/prospectus to its security holders. That document stated that a majority of the board believed the consideration to be received by United for the sale was fair and equitable and recommended approval of the sale, and that United's investment advisor believed the terms of the sale were fair. it also disclosed that a minority of the directors disagreed because of the increased prices of sugar and the estimated increased operating profits of the Sugar Company, that one director believed the proposed sale was unfair, and that three others believed the present value of the Sugar Company exceeded by a substantial amount the value of the consideration to be received from the sale.
On September 9, three other directors signed a document stating that they could not recommend the sale on the terms set forth in the contract. Because a majority of the directors no longer favored the sale, United suspended all proxy solicitation in favor of the sale on September 11.
On September 9 and 11, two stockholder derivative suits were filed against United's directors in the United States District Court for the Southern District of New York, based on alleged violations of the federal securities laws relating to proxy statements and violations of common law fiduciary duties. Both suits sought to enjoin United from convening the annual meeting and from soliciting, voting, or using proxies solicited in connection with the annual meeting.
A special meeting of the board of directors was called for September 14. The majority of the directors voted at that meeting to accept the new forecast of sugar prices and operating expenses. On the basis of that board action, the investment advisor withdrew its opinion letter as to the fairness of the consideration to be received. The directors then, by majority vote, adopted two resolutions, one recommending that stockholders not vote in favor of the sale, *382 and the second authorizing a discontinuation of favorable proxy solicitation.
After being informed that a majority of the directors were now recommending against the sale and that some of the figures in the prospectus had become misleading as a result of the increase in the price of sugar, the U.S. District Court in the consolidated stockholder derivative suits on September 19 and 20 ordered that proxies already obtained in favor of the sale not be used. The court also enjoined United from further distribution of the August 28 proxy statement/prospectus.
Proxy solicitation in favor of the sale was never resumed. A supplement to the proxy statement/prospectus was distributed September 20, advising the security holders that a majority of the board recommended against the sale. At the same time, new instructions were issued by United to the proxy solicitor not to urge a vote for and, if asked, to state that a majority of the directors recommended against.
Prior to the suspension of solicitation efforts on September 11, such proxies as had been returned were heavily in favor of the sale. After the suspension of favorable proxy solicitation, the response changed dramatically. At the September 30 meeting of security holders, the sale did not secure sufficient votes to be approved.
On appeal, the Co-Operative contends that the trial court erred in requiring it to prove not only that there was a breach of the "best efforts" clause, but also that had there not been a breach of that clause, the sale would have been approved by the security holders of United. Because we hold that the trial court should have granted United's motion for a directed verdict against the Co-Operative on the counterclaim for the reason that there was no evidence to show any breach of the "best efforts" clause, any error committed by the trial court with regard to proof of, or jury instructions on, the impact of that breach on the security holders' voting was harmless.
The real question in this case is what was meant by "best efforts." The Co-Operative argues that to comply with this clause, United, through its board of directors, was required to recommend the sale. We do not agree.
At the time the contract was executed, both parties knew that the sale could not take place unless approved by United's security holders, and the contract so provided. It also provided for compliance by United with state and federal securities laws.
Section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. 78n(a), regulates proxy solicitations by public corporations such as United. Rule 14a-9, 17 C.F.R. 240.14a-9, promulgated thereunder, requires that material information in proxy statements which has become misleading must be supplemented. See Gould v. American Hawaiian Steamship Co., 351 F.Supp. 853 (D.Del.1972); Pierre J. Le Landais & Co., Inc. v. MDS-Atron, Inc., 387 F.Supp. 1310 (S.D.N.Y.1974). The change in the Sugar Company's financial picture and the change in the views of the board members were material facts which had to be disclosed. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Consequently, United was required by federal law, and also by the ruling of the court in the New York stockholder derivative action, to supplement the proxy statement to disclose these new facts.
Under Colorado law, both the corporation, Supply Ditch Co. v. Elliott, 10 Colo. 327, 15 P. 691 (1887), and its directors owed a fiduciary duty to the security holders. Hudson v. American Founders Life Insurance Co., 151 Colo. 54, 377 P.2d 391 (1962); Kullgren v. Navy Gas & Supply Co., 110 Colo. 454, 135 P.2d 1007 (1943). Directors must "protect the rights of the company and act openly and aboveboard." Sprague v. Stratton-Massachusetts Gold Mines Co., 53 Colo. 315, 125 P. 490 (1912). They must "manage the corporate affairs in good faith, within the limits of the law applicable, and give the corporate entity the benefit of their best judgment and care." Herald Co. v. Seawell, 472 F.2d 1081 (10th Cir. 1972).
United and its directors were thus required by state and federal law to inform the security holders that, because of the *383 change in circumstances, they believed the terms for sale of the Sugar Company were no longer fair and equitable. The parties to the contract could not have contemplated that "best efforts" would include requiring United or its board to violate the law, and in fact the contract specifically required compliance by United with state and federal securities laws. Properly, the parties had to have intended only that United use its "best lawful efforts" to obtain security holder approval. The record before us amply demonstrates that so far as the law would allow, United and its board did use their best efforts to obtain security holder approval of the sale. Thus, the "best efforts" clause was complied with, and there was no breach.
The trial court and jury having arrived at the same result, the judgment is affirmed.
PIERCE and RULAND, JJ., concur.