376 F.2d 65
 67-1 USTC P 9334
 UNITED STATES of America, Appellant,
v.
Charles C. GATES, Jr., June S. Gates, Brown W. Cannon and
Charla Gates Cannon, Appellees.
UNITED STATES of America, Appellant,
v.
Brown W. CANNON and Charla Gates Cannon, Appellees.
 Nos. 8618, 8619.
 United States Court of Appeals Tenth Circuit.
 March 10, 1967.
 
 Solomon L. Warhaftig, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Richard C. Pugh, Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney and Loring W. Post, Attys., Dept. of Justice, Lawrence M. Henry, U.S. Atty., and David I. Shedroff, Asst. U.S. Atty., of counsel, on the briefs), for the United States.
 Dayton Denious, Denver, Colo., for appellees.
 Before PHILLIPS and HICKEY, Circuit Judges, and BRATTON, District judge.
 ORIE L. PHILLIPS, Circuit Judge.
 
 
 1
 The United States, claiming that certain refunds of income tax had been made erroneously, by these actions sought to recover the amounts thereof, with interest. The actions were consolidated for trial and from an adverse consolidated judgment, the United States has appealed. The facts our of which the controversies arose are these:
 
 
 2
 The Gates Rubber Company[1] is a Colorado corporation. On January 1, 1956, 97.6 per cent of its stock was owned by members of the Gates family of Denver, Colorado, and by trusts certain of such members had created. The remainder of such stock was owned by employees of the Corporation, each of whom had agreed to resell his stock to it at a certain stipulated percentage of its book value on his retirement from employment with the Corporation. During 1957 and 1958, the Corporation repurchased stock of three of its employees.
 
 
 3
 In the year 1956, Charles C. Gates, Jr., created a trust to which he irrevocably transferred 90 shares of stock of the Corporation. In 1957, he created a trust to which he irrevocably transferred 100 shares of stock of the Corporation. In 1957, Charla Gates Cannon created a trust to which she irrevocably transferred 111 shares of stock of the Corporation, and in 1958 she created a trust to which she irrevocably transferred 81 shares of stock of the Corporation.[2] The trusts are similar in all material respects. By the provisions of each trust, the trustees are to pay to the Gates Foundation,[3] a charitable corporation, in annual or more frequent installments the entire net income from the trust estate, during a designated term, being 20 years under each of the Gates, Jr., trusts and 18 years under each of the Cannon trusts.
 
 
 4
 Each of the Gates, Jr., trusts provides that from and after the expiration of the term during which such income is to be paid to the Foundation, the trustees shall distribute the entire net income of the trust estate in annual or more frequent installments among the settlor's lineal descendants surviving at the time of each distribution, in equal shares per stirpes, and if none of the settlor's lineal descendants so survive, then to the settlor's wife, June S. Gates, if living, and if not, among the settlor's sisters and their lineal descendants surviving at the time of each distribution, in equal shares per stirpes.
 
 
 5
 Each of the Cannon trusts provides that from and after the expiration of the term during which the net income is to be paid to the Foundation, the trustees shall distribute the entire net income of the trust estate in annual or more frequent installments among the settlor's lineal descendants surviving at the time of each distribution, in equal shares per stirpes, and if none of the settlor's lineal descendants so survive, then among the settlor's sisters and her brother, Charles C. Gates, Jr., and their lineal descendants surviving at the time of each distribution, in equal shares per stirpes.
 
 
 6
 Each of the Gates, Jr., trusts provides that upon its termination, as provided for therein, the trustees shall distribute the principal and undistributed income thereof among the settlor's lineal descendants then surviving in equal shares per stirpes, and if none of such descendants of the settlor then survive, then among the surviving lineal descendants of the settlor's sisters, in equal shares per stirpes.
 
 
 7
 Each of the Cannon trusts provides that upon its termination, as provided for therein, the trustees shall distribute the principal and undistributed income thereof among the settlor's lineal descendants then surviving, in equal shares per stirpes, and if none of the settlor's lineal descendants then survive, then among the surviving lineal descendants of the settlor's brother, Charles C. Gates, Jr., and the settlor's sisters, in equal shares per stipes.
 
 
 8
 Each of the Gates, Jr., trusts contains the following provision:
 
 
 9
 'No stock in The Gates Rubber Company shall be sold to any purchaser whomsover until after a written offer to sell such stock on the same price and terms has been made and communicated to each of the Settlor's sisters named in paragraph 4 then surviving, to each Gates Family Trust then in existence, to the Gates Rubber company and to Gates Foundation, and not until such offer has remained in force and unaccepted for a continuous period of thirty days.'
 
 
 10
 Each of the Cannon trusts contains the same provision, except that they also include with the settlor's sisters, her brother, Charles C. Gates, Jr.
 
 
 11
 In defining the powers of the trustees, each of the Gates, Jr. Trust in part provides:
 
 
 12
 'To litigate, compromiseAdjust and settle all claims arising out of or in connection with the Trust Estate or its administration.'
 
 
 13
 Each of the Cannon trusts gives the same powers to its trustees.
 
 
 14
 Charles C. Gates, Jr., made a gift tax return for the shares transferred by him to the trust created in 1956. In such return, he stated what he considered to be the total value of the 90 shares transferred and apportioned 49.734 per cent thereof to the income interest of the Foundation, as directed in Table II of Treasury Regulations 20.2031-7(c). He apportioned the balance to the remainder interests of the persons designated as remaindermen in the trust and reported that balance as a taxable gift and paid a gift tax thereon.
 
 
 15
 The 49.734 per cent apportioned to the income interest of the Foundation was deducted as a charitable contribution in the 1956 joint income tax return of Charles C. Gates, Jr., and June S. Gates, his wife.
 
 
 16
 The Commissioner of Internal Revenue determined that the value of the shares transferred was greater than that reported in the gift tax return. This increased the value of the remainder interests, resulting in an additional gift tax, which Charles C. Gates, Jr., paid. The additional gift tax was assessed only on the remainder interests and no gift tax was asserted on the value of the income interest of the Foundation.
 
 
 17
 Charles C. Gates, Jr., and June S. Gates, his wife, filed a claim for an income tax refund, asserting that because of the increase in the value of the stock transferred, made by the Commissioner of Internal Revenue, the value of the income interest of the Foundation should be increased proportionately, and that their deduction for contributions in the 1956 return should be increased accordingly.
 
 
 18
 The claim for refund was audited by the Internal Revenue Service. It increased the amount of the charitable contribution based on 49.734 per cent of the increased value of the 90 shares and ordered a refund, which was paid, and is now attacked as erroneous.
 
 
 19
 The facts with respect to a gift tax return made by Charles C. Gates, Jr., for the 1957 transfer; a joint income tax return for 1957, made by Charles C. Gates, Jr., and June S. Gates, his wife; an action of the Commissioner of Internal Revenue in increasing the value of the shares transferred in 1957; a resulting claim for refund; an audit thereof by the Internal Revenue Service, and a refund ordered and paid, differ in no material particular from the facts stated in the preceding five paragraphs, except as to the tax year involved, and except the differences resulting from the fact that the number of shares transferred in 1957 was 100, instead of 90.
 
 
 20
 Mrs. Charla Gates Cannon made a gift tax return for the shares transferred by her to the trust created by her in 1957. In such return she stated what she considered to be the total value of the 111 shares transferred and apportioned 46.1639 per cent thereof to the income interest of the Foundation, as directed in Table II of Treasury Regulations 20.2031-7(c). She apportioned the balance to the remainder interests of the persons designated as remaindermen in the trust and reported such balance as a taxable gift and paid the gift tax thereon.
 
 
 21
 Charla Gates Cannon and Brown W. Cannon made a joint income tax return for 1957 and deducted as a charitable contribution the 46.1639 per cent apportioned to the income interest of the Foundation. The Commissioner of Internal Revenue found that the value of the shares transferred was greater than the value reported in the gift tax return of Charla Gates Cannon and determined an additional gift tax, which was paid by Charla Gates Cannon. The additional gift tax was levied only on the remainder interests and no tax was asserted on the value of the income interest of the Foundation.
 
 
 22
 Charla Gates Cannon and Brown W. Cannon Filed a claim for an income tax refund, asserting that because of the increase in the value of the stock transferred, made by the Commissioner of Internal Revenue, the value of the income interest of the Foundation should be increased proportionately, and that their deductions for contributions in their 1957 return should be increased accordingly.
 
 
 23
 The claim for refund was audited by the Internal Revenue Service. It increased the amount of the charitable contribution on the basis of 46.1639 per cent of the increased balue of the 111 shares and ordered a refund, which was paid, and is now attacked as erroneous.
 
 
 24
 The facts with respect to a gift tax return made by Charla Gates Cannon for the year 1958 transfer; a joint income tax return for 1958, made by Charla Gates Cannon and Brown W. Cannon; an action of the Commissioner of Internal Revenue in increasing the value of the shares transferred in 1958; a claim for refund; an audit thereof by the Internal Revenue Service; and a refund ordered and paid, differ in no material particular from the facts stated in the preceding four paragraphs, except as to the tax year involved, and except the differences resulting from the fact that the number of shares transferred in 1958 was 81 shares.
 
 
 25
 Charles C. Gates and John G. Gates, father and uncle, respectively, of Charles C. Gates, Jr., first entered the rubber business in Denver, Colorado, in 1911, using the name, 'Colorado, Tire and Leather Company.' In 1913, they organized the Corporation. Charles C. Gates was its first president and continued to hold that office until after December 31, 1958. At the time of the transfers here involved, and for a number of years prior thereto, John G. Gates was vice-president and Charles C. Gates, Jr., was secretary and treasurer of the Corporation, and Charles C. Gates, John G. Gates and Charles C. Gates, Jr., constituted its board of directors. At the time of the trial in 1965, Charles C. Gates, Jr., had succeeded his father as president of the Corporation.
 
 
 26
 The Corporation enjoyed a continuous and healthy growth. That was in large part due to the fact that for many years prior to the time of the trial below its officers and directors followed a fixed policy to retain in the Corporation at the end of each fiscal year a substantial part of its earnings for such year, in order to provide working capital needed by reason of its continuous growth and to maintain it in a financially sound and healthy condition.
 
 
 27
 Attached hereto as Appendix I is a chart showing the amounts of the gross and net income, of dividends declared and paid, of earnings retained in the business, of net income per share of common stock outstanding and of dividends declared and paid per share on such common stock for each of the years 1947 to 1964, inclusive, except the year 1962.[4]
 
 
 28
 In fiscal 1947 the net
earnings after taxes were $5,275,675;
the amount paid in cash
dividends was 362,075;
and the amount retained
in the business was 4,913,600.
In fiscal 1951 the net
earnings after taxes were $6,462,746;
the amount paid in cash
dividends was 868,920;
and the amount retained
in the business was 5,593,826.
In fiscal 1955 the net
earnings after taxes were $6,880,270;
the amount paid in cash
dividends was 723,440;
and the amount retained
in the business was 6,156,830.
In fiscal 1956 the net
earnings after taxes were $7,832,358;
the amount paid in cash
dividends was 721,900;
and the amount retained
in the business was 7,110,458.
In fiscal 1958 the net
earnings after taxes were $6,787,376;
the amount paid in cash
dividends was 719,790;
and the amount retained
in the business was 6,067,586.
 
 
 29
 The Corporation declared and paid dividends of $1 per share for each of the years 1935 to 1941, inclusive, $3 per share in 1942, $3.50 per share in 1943, $3 per share in 1944, $5 per share in 1945, 1946 and 1947, $7 per share in 1948 and 1949, $10 per share in 1950, $12 per share in 1951, $10 per share in the years 1952 to 1963, inclusive, and $12 per share in 1964. It was the consistent policy of the Corporation to transfer to surplus sufficient earnings each year to guarantee the payment of dividends in future low-income years, if any occurred.
 
 
 30
 At the time of the transfers here involved, in terms of position in the rubber industry, the Corporation had become sixth in size of the American rubber companies, although it was only about one-ninth the size of each of the five major companies. The Corporation has survived and prospered, when other small rubber companies were forced to merge with or sell to a larger company or go out of business.
 
 
 31
 The Corporation is at a disadvantage competing with the major rubber companies. It costs the Corporation just as much to design, develop and prove a new automobile tire as it does a major company, yet the latter will sell about 20 times the number of such new tires as will the Corporation. The officers and directors of the Corporation believed that in order to meet such competition and to maintain it as a financially strong and healthy organization and to insure the payments annually of dividends to its stockholders, it was compulsory for it to plow back into the Corporation each year a very substantial amount of its net earnings entirely adequate to meet future needs, keep its plan up-to-date and modernized and its operation as streamlined and efficient as the operations of the major rubber companies; and they consistently followed that policy. The continuous growth of the Corporation, its ability to meet competition, and to pay substantial dividends and transfer sufficient funds to surplus to maintain adequate reserves over a long period of years, demonstrate the wisdom of that policy and that its business and operations were very well managed by its officers and directors.
 
 
 32
 Attached hereto as Appendix II is a chart showing the financial position of the Corporation at the end of the years 1947 to 1964, inclusive, except the year 1962.
 
 
 33
 At the end of the fiscal year 1947 the total current
assets of the Corporation were $25,321,527
The current liabilities were 8,119,500
The net current assets were 17,202,027
Investments and other assets were 241,216
Property, plant and equipment were 8,811,236
Less reserves 1,164,024
Leaving and excess of assets over liabilities of 25,090,455
At the end of the fiscal year 1951 the total current
assets of the Corporation were $29,586,505
The current liabilities were 8,099,845
The net current assets were 21,486,660
Investments and other assets were 506,215
Property, plant and equipment were 17,912,825
Less reserves None
Leaving an excess of assets over liabilities of 39,905,700
At the end of the fiscal year 1956 the total current
assets of the Corporation were $46,685,877
The current liabilities were 9,526,870
The net current assets were 37,159,007
Investments and other assets were 2,944,293
Property, plant and equipment were 2,944,293
Less reserves None
Leaving an excess of assets over liabilities of 63,002,637
At the end of the fiscal year 1958 the total current
assets of the Corporation were $51,925,199
The current liabilities were 11,364,074
The net current assets were $40,561,125
Investments and other assets were 3,462,108
Property, plant and equipment were 29,922,813
Less reserves None
Leaving and excess of assets over liabilities of 73,946,046
 
 
 34
 In 1958, the Foundation received $5,200 in dividends on stock of the Corporation, the income interest in which for stated periods had been transferred to it by Charles C. Gates, Jr., Charla Gates Cannon, and Hazel Gates Woodruff. It also received $700 in dividends on stock of the Corporation, which it owned.
 
 
 35
 The Corporation, as stated above, was a family-owned corporation. In order for the directors of the Corporation, Charles C. Gates, John G. Gates, and charles C. Gates, Jr., to deprive the Foundation of such $5,900 in income annually, on the basis of the 1958 dividend rate, they would have to deprive themselves and Charla Gates Cannon and Hazel Gates Woodruff of $388,738 in dividends annually, on the basis of the 1958 dividend rate. They would also have to deprive Mrs. Charles C. Gates, LeBurta Gates Atherton, Berenice Gates Loughridge, and the children of Harry F. Gates, deceased, of $298,982 in dividends annually, on the basis of the 1958 dividend rate. They would also have to depart from a dividend policy which had been followed consistently each year since 1935. Moreover, they would expose the Corporation to the probable imposition under 531 and 532 of the Internal Revenue Code of 1954 of an accumulated earnings tax. Those sections provide that a corporation shall be subject to such tax, when for the purpose of avoiding the income tax with respect to its shareholders, it permits earnings and profits to accumulate, instead of being divided or distributed, and 533 of the Internal Revenue Code of 1954 provides that for the purpose of 532 the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid income tax with respect to its shareholders, unless the corporation by the preponderance of the evidence shall prove the contrary. It has been held that by so accumulating dividends and subjecting the corporation to an accumulated earnings tax, the directors subject themselves to personal liability to reimburse the corporation for any such tax.[5]
 
 
 36
 The actions were consolidated for trial. At the close of the evidence, the United States moved the court to direct the jury to return a consolidated verdict in its favor in the actions. The motion was denied. The jury returned a consolidated verdict in favor of Charles C. Gates, Jr., June S. Gates, Brown W. Cannon and Charla Gates Cannon. The United States Then moved for a consolidated judgment in its favor in the action, notwithstanding the consolidated verdict. The motion was denied.
 
 
 37
 Treasury Regulations on Income Tax, 1954, 1.170-1(e), in part here pertinent, reads:
 
 
 38
 '(e) Transfers subject to a condition or a power.-- If as of the date of a gift a transfer for charitable purpose is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. If an interest passes to or is vested in charity on the date of the gift and the interest would be defeated by the performance of some act or the happening of some event, the occurrence of which appeared to have been highly improbable on the date of the gift, the deduction is allowable. The deduction is not allowed in the case of a transfer in trust conveying a present interest in income if by reason of all the conditions and circumstances surrounding the transfer it appears that the charity may not receive the beneficial enjoyment of the interest. * * *'
 
 
 39
 The complaint in No. 8618 alleged that the refunds of income taxes for the years 1956 and 1957, paid to Charles C. Gates, Jr., and June S. Gates, and the refund of income tax for the year 1957, paid to Brown W. Cannon and Charla Gates Cannon, were erroneously made, for the reasons:
 
 
 40
 '(a) Under the provisions of Section 1.170-1(e) of the Treasury Regulations under the Internal Revenue Code of 1954, the defendants were not entitled to any deduction as a contribution to charity for the property transferred in trust by the defendants Charles C. Gates, Jr., and Charla Gates Cannon during the years 1956 and 1957, because by reason of all the conditions and circumstances surrounding the transfers, Gates Foundation might not receive the beneficial enjoyment of the interest in income of the property transferred; and
 
 
 41
 '(b) The defendants were not entitled to any deduction as a contribution to charity for the property transferred in trust by the defendants Charles C. Gates, Jr., and Charla Gates Cannon during the years 1956 and 1957, because under all the facts and circumstances, the interest in such property transferred to Gates Foundation had no fair market value, since Gates Foundation might never receive any income or the beneficial enjoyment of such property.'
 
 
 42
 The complaint in No. 8619, as grounds for the action, contained substantially the same averments, except they referred to a refund of income tax paid for the year 1958, made to Charla Gates Cannon and Brown W. Cannon.
 
 
 43
 The court instructed the jury in part as follows:
 
 
 44
 'Insofar as pertinent to this controversy, the regulations provide in effect that * * * the transfer by trust of the income of corporate stock to a charity for a period of time is an allowable deduction under certain circumstances.
 
 
 45
 'Now the regulations provide in effect that the deduction is not allowed, however, if by reason of all the conditions and circumstances surrounding the transfer it appears that the charity may not receive the beneficial enjoyment of the interest.
 
 
 46
 'Now that is the question that we are here to determine, and the plaintiff contends that from the evidence of the conditions and circumstances surrounding the transfers here involved, it appears that the charity may not receive the beneficial enjoyment of income.
 
 
 47
 'Now the burden of proof is upon the Government to prove its contention by a preponderance of the evidence. The defendants contend that it does not appear from the conditions and circumstances surrounding the transfer that the Gates Foundation may not receive the income from the trust property.
 
 
 48
 'Therefore, the only question submitted to you-- and it will be submitted in substantially this form-- is whether or not from a preponderance of the evidence as to the conditions and circumstances surrounding the transfers it appears that (the) charity may not receive the beneficial enjoyment of income from the stock.'
 
 
 49
 Throughout the trial, including the oral arguments, the theory upon which the United States predicated its case, as stated by its counsel, was that under the facts and circumstances surrounding each of the transfers, the charity, here the Foundantion, might not receive the beneficial enjoyment of the interests transferred, and in the course of the trial counsel for the United States stated:
 
 
 50
 'The issue in this case * * * is in substance whether a certain section of the Treasury regulations result in disallowance of the deduction here involved, and in disallowing or attempting to disallow the deduction the Government relies on specifically a certain part of that regulation which reads as follows:
 
 
 51
 "The deduction is not allowed in the case of a transfer in trust conveying a present interest in income if by reason of all the conditions and circumstances surrounding the transfer, it appears taht the charity may not receive the beneficial enjoyment of the interest."
 
 
 52
 And in his charge to the jury the court presented the issue and the theory on which the United States relied, as it was stated by counsel for the United States in the course of the trial. Yet in this court, counsel for the United Staes, in their brief and in oral argument, place reliance on the language in the first sentence of the Regulation, and contend that the transfers did not result in allowable charitable deductions, because the possibility that the Foundation (the charity) would not receive any beneficial interest was not 'so remote as to be negligible.'
 
 
 53
 The United States, having led the court to try the case and to charge the jury on the theory that the third sentence of the Regulation is the pertinent and applicable part thereof, may not in this court 'change its hold' and depart from the theory on which it tried the case below and advance a new theory as a basis for a claim of trial error.
 
 
 54
 Moreover, the first sentence of the Regulation deals with transfers subject to conditions precedent that are not to become effective until the performance of some act or the happening of a future event. Here, the transfers made were not subject to conditions either precedent or subsequent and the gifts vested immediately for the benefit of the Foundation. As we view the case, the only question is whether, under all the facts, conditions and circumstances surrounding the transfers, it appeared that the Foundation might not receive the enjoyment of the beneficial interests.
 
 
 55
 We do not think the third sentence of the Regulation requires that under the existing facts, circumstances and conditions surrounding the transfer, it must appear with absolute certainty that the charity will receive the beneficial enjoyment of the interest transferred to it, in order for the deduction to be allowable as a charitable gift. Very few things in life are absolutely certain. Future events cannot be predicted with positive certainty. The certainty required by the Regulation is that degree of certainty with respect to the occurrence of a future event that would cause an ordinarily prudent person in the usual affairs of business and of life not to hesitate to act in reliance on it occurring.
 
 
 56
 Hence, the test here is whether the assurance of certainty that the Foundation would receive such beneficial interest was such that an ordinarily prudent person possessed of the same assurance of certainty with respect to a like future event in the ordinary affairs of life and business, would regard the occurrence of such event sufficiently certain to warrant his acting in reliance on its occurrence, and would believe that in so doing he would risk only 'the general uncertainty that attends human affairs.'
 
 
 57
 The deduction as a charitable gift will be allowed, unless the uncertainty that the charity will not receive the beneficial enjoyment thereof is 'appreciably greater than the general uncertainty that attends human affairs.'[6]
 
 
 58
 Of course the Commissioner, in passing on the claims for refund, had to determine whether or not, under the facts, circumstances and conditions surrounding each transfer at the time it was made, any uncertainty that the Foundation would receive the beneficial enjoyment thereof was appreciably greater than 'the general uncertainty that attends human affairs.'
 
 
 59
 The Commissioner found and determined, with respect to the gifts here involved, that the requisite certainty to warrant the granting of the claimed refunds was present, and he experienced no difficulty in fixing the value of the gifts to the Foundation, when he determined the amounts of the deductions. It is well settled that such a finding and determination by the Commissioner is presumptively correct.[7]
 
 
 60
 It is our opinion that the undisputed facts, with respect to the business of the Corporation, the efficiency of its operations, the keeping of its plant modernized and up-to-date, the high quality of its management, its financial condition, the amount of its profits-- gross and net, the amounts declared and paid as dividends, the amount of net earnings transferred to surplus, and the policies consistently followed by the officers and directors, in the respective years such transfers were made, namely, 1956, 1957 and 1958, and the undisputed facts with respect to all of such matters during a long period of years immediately preceding 1956, all reflected in the record in detail, would lead a reasonably prudent person, competent by training and experience to judge the future of the Corporation, unhesitatingly to conclude that during the period of 24 years immediately following 1956, it would continue to grow and prosper and would be able to and would transfer amounts to surplus entirely adequate to meet all of its future requirements and also would be able to pay and would pay substantial dividends. And it is further our opinion that under undisputed facts in the record and reasonable inferences that may be drawn therefrom, a prediction that such events would occur would be attended with as much certainty as are predictions regularly made and acted upon, in the ordinary affairs of business and of life, and would be accompanied only with 'the general uncertainty that attends human affairs.'
 
 
 61
 The contention is made that since the directors of the corporation are members of the Gates family, which owns practically all of the stock in the Corporation, and the remainder beneficiaries under the trusts will be either living members of the Gates Family, or in the event of their demise during the life of the trusts, the lineal descendants or close relatives of such members, such directors, to serve a selfish purpose to benefit such remaindermen, might pass dividends and accumulate earnings for a period of 21 years after 1956, most of which would ultimately inure to the benefit of such remaindermen and the other members of the Gates family, if the well justified assumption is made that the family will continue to own almost all of the Corporation's stock. The facts and circumstances as they existed when the respective transfers were made, the past history, referred to above, the consistent policy of the directors to declare and pay dividends, the risk of an accumulated earnings tax, if earnings are accumulated beyond the needs of the business, and the very large reduction in the income of the directors and other members of the Gates family that would ensue each year a dividend was passed, seem to us to make such contention wholly untenable.
 
 
 62
 Furthermore, such contention is otherwise fefuted. While, generally, whether a dividend shall be declared and paid by a corporation is a matter to be determined by the board of directors in the exercise of a sound discretion and honest business judgment,[8] such discretion is not unlimited. It must be honestly exercised for the benefit of the corporation and all of its shareholders.[9] A director of a corporation occupies a fiduciary relationship to the corporation and its stockholders, and a dominant or controlling stockholder or group of stockholders occupies a fiduciary relationship to the minority stockholders.[10]
 
 
 63
 With respect to the standards of conduct to which the law requires a trustee to conform, this court in Wootten v. Wootten, 10 Cir., 151 F.2d 147, at 149, 161 A.L.R. 1027, said:
 
 
 64
 'Many forms of conduct regarded as permissible for those acting at arm's length are forgidden to those bound by fiduciary ties. The standards of conduct for a trustee rise far above the ordinary morals of the market place. Not honesty alone, but a punctilio of honor the most sensitive is the standard of behavior required of a trustee. He must completely efface self-interest. His loyalty and devotion to his trust must be unstinted. Its wellbeing must always be his first consideration. These principles are inveterate and unbending.'[11]
 
 
 65
 Here, the members of the Gates family form a dominant group of stockholders of the Corporation, and they and the directors whom they elect control the Corporation. It follows that the directors, in their official capacity and as members of such dominant group of stockholders, occupy a fiduciary relationship to the holders of minority stockholder interests, and that they owe a duty to exercise their powers as directors with unbending fidelity to their cestuis que trustent and to manage the affairs of the Corporation in a way that will be fair and impartial between the Gates family group, as majority stockholders, and the Foundation and other holders of minority stock interests, and not to the personal advantage of themselves or other members of the Gates family or to the disadvantage or detriment of the Foundation and other holders of minority stock interests. We think the evidence clearly demonstrates and established that, subject to the general uncertainty that attends human affairs, the Corporation, during the 21 years immediately following 1956, will continue to realize net earnings sufficient to pay substantial dividends, to transfer substantial amounts to surplus, and to maintain reserves entirely adequate for its future needs. If such earinings are so realized, it will be the duty of the directors, because of their fiduciary relationship to the holders of common stock, and particularly to minority stockholder interests, to continue to declare and pay dividends on the corporate stock and it will further be their duty not to accumulate earnings beyond the reasonable needs of the business and subject the Corporation to the danger of an accumulated earnings tax.
 
 
 66
 And if such net earnings are it will be the duty of the trustees of the trusts to lay aside all personal interests, to faithfully perform their duties as trustees and take whatever steps may be necessary, including a suit in equity, to compel the payment of the dividends.[12] And equity would grant them relief in such an action.[13]
 
 
 67
 It is well settled that it will be presumed that a trustee will efface personal interests and faithfully and honestly perform his duties to his cestui que trust.[14] Here, there was no evidence that would overcome the presumption, and the evidence as to actions of the directors and trustees in the years 1956 to 1964, inclusive, showed they were faithfully performing their duties as such fiduciaries.[15]
 
 
 68
 Counsel for the United States assert that during the 19-year period following 1958 conditions may so change that the directors will properly conclude that for sound business reasons dividends should not be paid, or that it would be wise business policy to use all the earnings for research, plant modernization, development and expansion, or other business purposes.
 
 
 69
 The steady growth and uninterrupted business success of the Corporation, the amount of current gross and net earnings, the amount of earnings transferred to reserves, the adequacy of such reserves to keep the plant modernized and to expand the business, the high quality of the management and the efficiency of the operations, in 1958 and for many years immediately prior thereto, made it appear exceedingly improbable at the times the transfers were made that either financial needs of the Corporation or business conditions would cause the directors to pass dividends during any of the years 1959 to 1977, inclusive. That is confirmed by the data shown on Appendices I and II, with respect to the years 1959 to 1964, inclusive. We think, under the evidence, it is abundantly clear at the times the transfers were made that the payment of dividends by the Corporation during the years 1959 to 1977, inclusive, would be attended with no greater uncertainty than 'the general uncertainty that attends human affairs.' Indeed, we think the stockholders of the Corporation at the times the transfers were made could look forward to receiving dividends during those years with a high degree of assurance.
 
 
 70
 Each of the trusts here involved provides that the trustees thereof are not required to sell and may retain nonproductive property.
 
 
 71
 Counsel for the United States assert that should dividends not be paid during the respective periods the Foundation is to receive the dividends paid on the stock transferred to the trusts, the trustees nevertheless may retain the nonproductive stock and therefore the Foundation may not receive the enjoyment of the beneficial interests transferred.
 
 
 72
 It is true that the trustees are not compelled to sell nonproductive property, but they also have power to sell it, and in determining whether they shall sell or hold it, they must exercise good faith and an honest business judgment, wholly effacing their personal interests and fully conscious of their fiduciary obligations to the Foundation. We must presume, there being no evidence to the contrary, that the directors will do so, and that they will not hold nonproductive stock of the Corporation to the detriment of the Foundation for the long period of 18 or 20 years, in order to benefit others.
 
 
 73
 Moreover, we think the facts, circumstances, and conditions surrounding the several transfers, considered in the light of the prior business history of the Corporation, fully warranted the conclusion that the stock would not become nonproductive, due to inadequate earnings, during the respective periods the Foundation is to receive the dividends paid thereon. That conclusion is confirmed by the net earnings realized, dividends paid and policies followed by the Corporation in the respective periods between the years in which the several transfers were made and the end of fiscal 1964. Those periods covered one-third of the period the Foundation is to receive the dividends under the 1958 Cannon trust and more than one-third of the respective periods it is to receive the dividends under the three earlier trusts.
 
 
 74
 With respect to the contention asserted by counsel for the United States 'that the officers, directors, or stockholders of' the Corporation 'have the power to refuse to declare any dividends on the stock of' the Corporation, the court instructed the jury as follows:
 
 
 75
 '* * * that power in and of itself is not sufficient for you to find that the deduction in question is not allowable.
 
 
 76
 'The burden of proof is upon the Government to prove not only that the power exists to accomplish that, but also that the circumstances surrounding the transfer make it appear that the officers, directors or stockholders of The Gates Rubber Company may exercise that power for the purpose of depriving the Gates Foundation of the income from this stock.'
 
 
 77
 With respect to the contention asserted by counsel for the United States that 'the trustees of these trusts have the power to sell' the Corporation 'stock and to reinvest the proceeds in non-income producing property,' the court instructed the jury as follows:
 
 
 78
 '* * * this power standing alone is not sufficient for you to find that the deduction is not allowable.
 
 
 79
 'Again, the burden of proof is upon the Government to prove not only that the trustees have the power to deprive the Gates Foundation of income from the trust property, but must also prove that the conditions and circumstances surrounding the transfer make it appear that the trustees may utilize this power * * * for the purpose * * * of depriving the Gates Foundation of the income.'
 
 
 80
 Counsel for the United States objected to that part of the instructions which required the Government to show that the powers referred to may be exercised 'for the purpose * * * of depriving the * * * Foundation of the income.'
 
 
 81
 In accord with the position he had taken during the trial, counsel for the United States in his argument to the jury asserted: That the members of the Gates family group own 98 per cent of the stock of the Corporation and by virtue thereof dominate and control it; that they cooperate in determining its policies; that they have a fixed purpose to maintain family control of the Corporation; that their voting power enables them to select as its board of directors members of such group; that Charles C. Gates, Jr., and Charla Gates Cannon can control the action of the directors with respect to the payment of dividends and being members of an interlocking trusteeship under the six Gates family trusts can control the actions of the trustees in administering such trusts; that the directors have authority, even though sufficient net earnings are realized to enable the Corporation to transfer to surplus amounts sufficient to maintain fully adequate reserves and provide for its future needs, and also to pay substantial dividends, to determine that dividends shall not be paid and that all of the net earnings shall be accumulated; and that the trustees have power to retain and not dispose of the stock, even though it becomes nonproductive because of the nonpayment of dividends; that each member of the Gates family group has a large income in addition to his or her income from dividends, which additional income is entirely adequate for his or her needs; and that if dividends are not paid during the respective periods the Foundation is to receive dividends if paid, on the stock transferred to the trusts, the earnings accumulated as a result of such nonpayment of dividends, other than the earnings that would have been paid to the Foundation had dividends been paid, will not be lost, but will enhance the value of the Corporation's stock and may be paid out in deferred dividends after 1977, when all of such periods will have ended, and thus ultimately will inure to the benefit of the members of the Gates family group; and if dividends are not paid during such periods, the earnings which would have been received by the Foundation had dividends been paid, likewise will not be lost, but by reason of the increased value of the Corporation's stock or the payment of deferred dividends after all of such periods have ended, will ultimately inure to the benefit of the surviving remaindermen under the trusts-- the then living lineal descendants of Charles C. Gates, Jr., and Charla Gates Cannon, or other near relatives.
 
 
 82
 And counsel for the United States, in his argument to the jury, strongly intimated that because net earnings not paid out in dividends, but accumulated during the periods the Foundation is to receive dividends on the stock transferred to the trusts, would not be lost, but would inure, as stated above, and particularly because that part of the net earnings which the Foundation would receive if dividends were declared, as a result of their nonpayment would not go to the Foundation but would inure ultimately to the surviving remaindermen under the trusts, the directors, being members of the Gates family group and subject to the influence of other members thereof, would be inclined not to declare dividends during such periods. In other words, that the directors, influenced as they would be by the members of the Gates family group, would be inclined to violate their solemn fiduciary duties and obligations to the minority stock interests, including the Foundation, by conducting the affairs of the Corporation during such periods to the advantage of the members of the Gates family group and the remainder beneficiaries under the trusts and to the detriment of the Foundation and other minority interests.
 
 
 83
 It is true that counsel for the United States in his argument denied he had any intent to impugn the integrity of either Charles C. Gates, Jr., or Charla Gates Cannon. We think he did so impugn their integrity when he suggested they would be inclined to violate their solemn fiduciary duties and obligations as trustees or influence other trustees to violate their duties and obligations.
 
 
 84
 In his argument, counsel for the United States further stated that the Gates family group, or Charles C. Gates, Jr., and Charla Gates Cannon 'may exercise that control'-- the control of the Corporation and its board of directors-- 'to deprive the charity of the income.' He reiterated in substance the last-quoted phrase several times in his opening argument and in his closing argument said: 'All we say is under the conditions and circumstances existing as of the day of each transfer, the control-- the family control may be exercised to deprive the Foundation of dividends.'
 
 
 85
 The court, in his instructions, in using the words 'exercise that power for the purpose of depriving the Gates Foundation of the income from this stock' merely employed in substance the phrase repeatedly used by counsel for the United States in his argument to the jury. Counsel put the words of such phrase in the mouth of the court. For that reason and because of the plain implications inherent in counsel's argument to the jury that during the period the Foundation was to receive the dividend income, the directors, in violation of their solemn duties and obligations to the minority interests, would be inclined to manage the affairs of the Corporation to the advantage of the members of the Gates family group and their lineal descendants and to the detriment of the Foundation and other minority interests, we conclude the United States may not now complain of such instructions.
 
 
 86
 Finally, counsel for the United States contend that the trial court erred in admitting evidence as to the settlors' intentions in creating the trusts, and as to the Corporation's contributions to the Foundation. Counsel for the United States impugned the good faith of the settlors in creating the trusts in the trial below. In his argument to the jury he said: 'I submit that the only purpose, or the primary purpose, of the transfer was for tax reasons.' In the case in chief, counsel for the United States introduced evidence that Charles C. Gates, Jr., at a luncheon in 1965 stated in effect that the stock of the Corporation was closely held and not owned by members of the general public and consequently the directors could plow back earnings into the Corporation for research and development and would be under no obligation to declare and pay out earnings as dividends on the stock.
 
 
 87
 Moreover, the testimony with respect to intent was not a mere ipse dixit of the subjective intent of the settlors of the trusts, but rather, of the existing facts and circumstances which obtained at the time the transfers were made, and which led the settlors to provide for the withholding of income from their children until they reached mature ages, and in the meantime to give the income to the Foundation.
 
 
 88
 Accordingly, we conclude that there was substantial evidence to support the verdict returned by the jury, and that there were no trial errors of such consequence as would warrant a reversal of the judgment below.
 
 
 89
 Affirmed.
 
 
 90
 APPENDIX I
 ----------
 1964 1963(A) *
 ----------------------- ----------------------
Net sales $145,536,553 $170,031,202
Other income 898,754 1,293,421
 ----------------------- ----------------------
 $146,435,307 $171,324,623
Cost of products sold $ 89,231,841 $100,678,538
Selling and administrative 43,534,806 51,183,098
 ----------------------- ----------------------
Net income before taxes on $ 13,668,660 $ 19,462,987
 income
Taxes on income 6,810,649 10,158,846
 ----------------------- ----------------------
Net income $ 6,858,011 $ 9,304,141
Cash dividends 800,119 692,106
 ----------------------- ----------------------
Earnings retained in business $ 6,057,892 $ 8,612,035
Per share of Common Stock (1) **
 Net income $102.85 $139.54
 Cash dividends $ 12.00 $ 10.00
 _________________________
 1961 1960
 ----------------------- ----------------------
Net sales $126,804,702 $126,742,307
Other income 689,691 719,854
 ----------------------- ----------------------
 $127,494,393 $127,462,161
Cost of products sold $ 82,755,501 $ 83,260,437
Selling and administrative 34,231,035 31,991,755
 ----------------------- ----------------------
 $116,986,536 $115,252,192
Net income before taxes on $ 10,507,857 $ 12,209,969
 income
Taxes on income 5,151,468 6,696,854
 ----------------------- ----------------------
Net income $ 5,356,389 $ 5,513,115
Cash dividends 688,516 688,515
 ----------------------- ----------------------
Earnings retained in business $ 4,667,873 $ 4,824,600
Per share of Common Stock
 Net income $ 77.80 $ 80.07
 Cash dividends $ 10.00 $ 10.00
 _________________________
* (A) Fifteen-month period ended March 2, 1963.1/5
** (1) Based on number of shares outstanding at the end of each fiscal
year.1/55
 1959 1958
 ------------ ------------
Net Sales $129,519,546 $107,449,262
Other income 1,777,197 823,741
 ------------ ------------
 $130,696,743 $108,273,003
Cost of products sold $ 79,265,848 $ 67,084,259
Selling and administrative 30,704,944 27,500,501
 ------------ ------------
 $109,970,792 $ 94,584,760
Net income before taxes on income $ 20,725,951 $ 13,688,243
Taxes on income 10,638,939 6,900,867
 ------------ ------------
Net income $ 10,087,012 $ 6,787,376
Cash dividends 701,096 719,790
 ------------ ------------
Earnings retained in business $ 9,385,916 $ 6,067,586
Per share of Common Stock
 Net Income $145.23 $ 96.81
 Cash dividends $ 10.00 $ 10.00
 _________________________
 1957 1956
 ------------ ------------
Net Sales $104,025,115 $102,068,970
Other Income 623,376 453,948
 ------------ ------------
 $104,648,491 $102,522,918
Cost of products sold $ 66,735,431 $ 62,218,934
Selling and administrative 24,384,062 24,117,468
 ------------ ------------
 $ 91,119,493 $ 86,336,402
Net income before taxes on income $ 13,528,998 $ 16,186,516
Taxes on income 6,992,526 8,354,158
 ------------ ------------
Net income $ 6,536,472 $ 7,832,358
Cash dividends 721,900 721,900
 ------------ ------------
Earnings retained in business $ 5,814,572 $ 7,110,458
Per share of Common Stock
 Net income $ 90.55 $ 98.50
 Cash dividends $ 10.00 $ 10.00
 1955 1954
 ------------ ------------
Net sales $ 93,811,905 $ 82,353,402
Other income 619,018 679,377
 ------------ ------------
 $ 94,430,923 $ 83,032,779
Cost of products sold $ 59,148,119 $ 52,588,597
Selling and administrative 21,902,928 22,809,096
 ------------ ------------
 $ 81,051,047 $ 75,397,693
Net income before taxes on income $ 13,379,876 $ 7,635,086
Taxes on income 6,499,606 3,941,160
 ------------ ------------
Net income $ 6,880,270 $ 3,693,926
Cash dividends 723,440 723,440
 ------------ ------------
Earnings retained in business $ 6,156,830 $ 2,970,486
Per share of Common Stock
 Net income $ 95.10 $ 51.06
 Cash dividends $ 10.00 $ 10.00
 _________________________
 1953 1952
 ------------ ------------
Net sales $ 80,028,928 $ 74,714,983
Other income 619,078 394,525
 ------------ ------------
 $80,648,006 $ 75,109,508
Cost of products sold $ 50,130,305 $ 47,671,774
Selling and administrative 21,765,557 20,705,349
 ------------ ------------
 $ 71,895,862 $ 68,377,123
Net income before taxes on income $ 8,752,144 $ 6,732,385
Taxes on income 4,084,599 2,956,002
 ------------ ------------
Net income $ 4,667,545 $ 3,776,383
Cash dividends 723,440 724,100
 ------------ ------------
Earnings retained in business $ 3,944,105 $ 3,052,283
Per Share of Common Stock
 Net income $ 64.52 $ 52.15
 Cash dividends $ 10.00 $ 10.00
 
 1951 1950
 
 91
 ------------ -------------
 
 
 92
 Net sales $ 85,199,169 $ 64,804,964
 
 
 93
 Other income 874,564 1,117,401
 
 
 94
 ------------ -------------
 
 
 95
 $ 86,073,733 $ 65,922,365
 
 
 96
 Cost of products sold $ 50,699,352 $ 40,672,574
 
 
 97
 Selling and administrative 19,359,994 17,218,576
 
 
 98
 ------------ -------------
 
 
 99
 $ 70,059,346 $ 57,891,150
 
 
 100
 Net income before taxes on income $ 16,014,387 $ 8,031,215
 
 
 101
 Taxes on income 9,551,641 3,418,280
 
 
 102
 ------------ -------------
 
 
 103
 Net income $ 6,462,746 $ 4,612,935
 
 
 104
 Cash dividends 868,920 724,150
 
 
 105
 ------------ -------------
 
 
 106
 Earnings retained in business $ 5,593,826 $ 3,888,785
 
 Per share of Common Stock
 
 107
 Net income $ 89.25 $ 63.70
 
 
 108
 Cash dividends $ 12.00 $ 10.00
 
 
 
 1949 1948 1947
 ------------ ------------ -------------
 Net sales $ 45,016,933 $ 55,291,368 $ 62,260,905
 Other income 291,958 277,347 452,993
 ------------ ------------ -------------
 $ 45,308,891 $ 55,568,715 $ 62,713,898
 Cost of products sold $ 27,331,254 $ 34,962,950 $ 38,855,355
 Selling and administrative 14,471,661 15,513,203 15,488,647
 ------------ ------------ -------------
 $ 41,802,915 $ 50,476,153 $ 54,344,002
 Net income before taxes on
 income $ 3,505,976 $ 5,092,562 $ 8,369,896
 Taxes on income 1,149,926 2,295,151 3,094,221
 ------------ ------------ -------------
 Net income $ 2,356,050 $ 2,797,411 $ 5,275,675
 Cash dividends 506,905 506,905 362,075
 ------------ ------------ -------------
 Earnings retained in business $ 1,849,145 $ 2,290,506 $ 4,913,600
 Per Share of Common Stock
 Net income $ 32.54 $ 38.63 $ 72.85
 Cash dividends $ 7.00 $ 7.00 $ 5.00
 APPENDIX II
 
 
 1964 1963 1961
 
 109
 ------------ ------------ -------------
 
 
 110
 Cash $ 8,664,629 $ 10,118,884 $ 10,893,947
 
 U.S. Goverment and other
 
 111
 marketable securities -0- 1,789,602 3,660,595
 
 
 112
 Receivables 22,064,503 21,012,666 17,094,006
 
 
 113
 Inventories 35,549,113 32,754,365 30,749,972
 
 
 114
 Deferred charges 992,033 929,792 655,599
 
 
 115
 ------------ ------------ -------------
 
 
 116
 TOTAL CURRENT ASSETS $ 67,270,278 $ 66,605,309 $ 63,054,119
 
 Less current liabilities:
 
 117
 Accounts payable, taxes, etc. 18,075,922 15,508,324 14,257,458
 
 
 118
 ------------ ------------ -------------
 
 
 119
 NET CURRENT ASSETS $ 49,194,356 $ 51,096,985 $ 48,796,661
 
 
 120
 Investments and other assets 13,280,270 6,101,739 4,797,869
 
 
 121
 Property, plant and equipment 42,393,475 41,611,485 38,284,005
 
 
 122
 ------------ ------------ -------------
 
 
 123
 $104,868,101 $ 98,810,209 $ 91,878,535
 
 
 124
 Less: Reserves -0- -0- -0-
 
 
 125
 ------------ ------------ -------------
 
 EXCESS OF ASSETS OVER
 
 126
 LIABILITIES $104,868,101 $ 98,810,209 $ 91,878,535
 
 Stockholders' equity:
 
 127
 Common stock outstanding $ 11,283,370 $ 11,283,370 $ 12,963,731
 
 
 128
 Earned surplus 93,584,731 87,526,839 78,914,804
 
 
 129
 ------------ ------------ -------------
 
 
 130
 $104,868,101 $ 98,810,209 $ 91,878,535
 
 
 
 1960 1959 1958
 ------------ ------------ -------------
 Cash $ 8,099,237 $ 11,597,811 $ 10,601,711
 U.S. Government and other
 marketable securities 894,295 551,881 82,600
 Receivables 19,971,379 18,898,889 16,174,436
 Inventories 30,902,399 30,508,161 24,624,632
 Deferred charges 333,479 463,426 441,820
 ------------ ------------ -------------
 TOTAL CURRENT ASSETS $ 60,200,789 $ 62,020,168 $ 51,925,199
 Less current liabilities:
 Accounts payable, taxes, etc. 11,537,679 14,498,959 11,364,074
 ------------ ------------ -------------
 NET CURRENT ASSETS $ 48,663,110 $ 47,821,209 $ 40,561,125
 Investments and other assets 4,077,267 3,594,730 3,462,108
 Property, plant and equipment 34,470,285 31,420,123 29,922,813
 ------------ ------------ -------------
 $ 87,210,662 $ 82,836,062 $ 73,946,046
 Less: Reserves -0- -0- -0-
 ------------ ------------ -------------
 EXCESS OF ASSETS OVER
 LIABILITIES $ 87,210,662 $ 82,836,062 $ 73,946,046
 Stockholders' equity:
 Common stock outstanding $ 12,963,731 $ 13,413,731 $ 13,909,631
 Earned Surplus 74,246,931 69,422,331 60,036,415
 ------------ ------------ -------------
 $ 87,210,662 $ 82,836,062 $ 73,946,046
 NOTE--Amounts are as of the close of fiscal years ended in November
 through 1961 and ended in February since that time.
 1957 1956 1955
 ------------ ------------ ------------
 Cash $ 12,513,495 $ 9,513,424 $ 12,926,412
 U. S. Government and other
 marketable securities 2,211,400 278,875 911,064
 Receivables 13,696,979 13,668,841 12,917,639
 Inventories 22,918,177 22,797,533 19,376,806
 Deferred charges 378,094 427,204 435,647
 ------------ ------------ ------------
 TOTAL CURRENT ASSETS $ 51,718,145 $ 46,685,877 $ 46,567,568
 Less current liabilities:
 Accounts payable, taxes, etc. 9,633,936 9,526,870 10,296,000
 ------------ ------------ ------------
 NET CURRENT ASSETS $ 42,084,209 $ 37,159,007 $ 36,271,568
 Investments and other assets 3,847,129 2,944,293 2,062,152
 Property, plant and equipment 23,010,951 22,899,337 17,665,832
 ------------ ------------ ------------
 $ 68,942,289 $ 63,002,637 $ 55,999,552
 Less: Reserves 120,000 -0- -0-
 ------------ ------------ ------------
 EXCESS OF ASSETS OVER
 LIABILITIES $ 68,822,289 $ 63,002,637 $ 55,999,552
 Stockholders' equity:
 Common stock outstanding $14,853,460 $14,855,550 $14,962,923
 Earned surplus 53,968,829 48,147,087 41,036,629
 ------------ ------------ ------------
 $ 68,822,289 $ 63,002,637 $ 55,999,552
 
 
 1954 1953 1952
 
 131
 ------------ ------------ ------------
 
 
 132
 Cash $ 5,742,394 $ 10,448,638 $ 8,793,819
 
 U. S. Government and other
 
 133
 marketable securities 64,733 261,103 1,435,926
 
 
 134
 Receivables 12,207,952 9,840,432 9,030,757
 
 
 135
 Inventories 18,020,193 15,097,300 13,821,562
 
 
 136
 Deferred charges 326,604 346,197 395,304
 
 
 137
 ------------ ------------ ------------
 
 
 138
 TOTAL CURRENT ASSETS $ 36,361,876 $ 35,993,670 $ 33,477,368
 
 Less current liabilities:
 
 139
 Accounts payable, taxes, etc. 7,225,489 6,374,253 6,515,973
 
 
 140
 ------------ ------------ ------------
 
 
 141
 NET CURRENT ASSETS $ 29,136,387 $ 29,619,417 $ 26,961,395
 
 
 142
 Investments and other assets 1,361,857 373,430 390,924
 
 
 143
 Property, plant and equipment 19,719,479 17,249,003 15,980,663
 
 
 144
 ------------ ------------ ------------
 
 
 145
 $ 50,217,723 $ 47,241,850 $ 43,332,982
 
 
 146
 Less: Reserves 375,000 375,000 375,000
 
 
 147
 ------------ ------------ ------------
 
 EXCESS OF ASSETS OVER
 
 148
 LIABILITIES $ 49,842,723 $ 46,866,850 $ 42,957,982
 
 Stockholders' equity:
 
 149
 Common stock outstanding $ 14,962,923 $ 14,962,923 $ 14,998,159
 
 
 150
 Earned surplus 34,879,800 31,903,927 27,959,823
 
 
 151
 ------------ ------------ ------------
 
 
 152
 $ 49,842,723 $ 46,866,850 $ 42,957,982
 
 1951 1950 1949
 
 153
 ------------ ------------ ------------
 
 
 154
 Cash $ 4,440,912 $ 6,103,821 $ 10,639,162
 
 U. S. Government and other
 
 155
 marketable securities 1,763,493 275,933 9,280
 
 
 156
 Receivables 7,963,269 8,855,848 4,169,842
 
 
 157
 Inventories 14,979,627 9,964,752 7,456,228
 
 
 158
 Deferred charges 439,204 296,892 280,737
 
 
 159
 ------------ ------------ ------------
 
 
 160
 TOTAL CURRENT ASSETS $ 29,586,505 $ 25,497,246 $ 22,555,249
 
 Less current liabilities:
 
 161
 Accounts payable, taxes, etc. 8,099,845 7,473,976 5,078,025
 
 
 162
 ------------ ------------ ------------
 
 
 163
 NET CURRENT ASSETS $ 21,486,660 $ 18,023,270 $ 17,477,224
 
 
 164
 Investments and other assets 506,215 387,259 279,418
 
 
 165
 Property, plant and equipment 17,912,825 15,906,647 12,668,288
 
 
 166
 ------------ ------------ ------------
 
 
 167
 $ 39,905,700 $ 34,311,176 $ 30,424,930
 
 
 168
 Less: Reserves -0- 5,301 -0-
 
 
 169
 ------------ ------------ ------------
 
 EXCESS OF ASSETS OVER
 
 170
 LIABILITIES $ 39,905,700 $ 34,311,875 $ 30,424,930
 
 Stockholders' equity:
 
 171
 Common stock outstanding $ 14,998,159 $ 14,998,159 $ 3,873,693
 
 
 172
 Earned surplus 24,907,541 19,313,716 26,551,237
 
 
 173
 ------------ ------------ ------------
 
 
 174
 $ 39,905,700 $ 34,311,875 $ 30,424,930
 
 
 
 1948 1947
 ------------ ------------
 Cash $ 7,035,090 $ 9,251,826
 U. S. Government and other
 marketable securities 546,297 -0-
 Receivables 5,840,169 6,910,858
 Inventories 11,715,019 8,776,881
 Deferred charges 326,858 381,962
 ------------ ------------
 TOTAL CURRENT ASSETS $ 25,463,433 $ 25,321,527
 Less current liabilities:
 Accounts payable, taxes, etc. 7,132,852 8,119,500
 ------------ ------------
 NET CURRENT ASSETS $ 18,330,581 $ 17,202,027
 Investments and other assets 246,992 241,216
 Property, plant and equipment 9,998,212 8,811,236
 ------------ ------------
 $ 28,575,785 $ 26,254,479
 Less: Reserves -0- 1,164,024
 ------------ ------------
 EXCESS OF ASSETS OVER
 LIABILITIES $ 28,575,785 $ 25,090,455
 Stockholders' equity:
 Common stock outstanding $ 3,873,693 $ 3,873,693
 Earned surplus 24,702,092 21,216,762
 ------------ ------------
 $ 28,575,785 $ 25,090,455
 
 
 [1]
 Hereinafter called the Corporation
 
 
 [2]
 The trustees of each of the Gates, Jr., trusts are Hazel Gates Woodruff, Charla Gates Cannon, and John G. Gates
 The trustees of the 1957 Cannon trust are Hazel R. Gates, Charles C. Gates, Jr., and Hazel Gates Woodruff, and of the 1958 Cannon trust are Hazel Gates Woodruff, Charles C. Gates, Jr., and John G. Gates.
 
 
 [3]
 Hereinafter called the Foundation
 
 
 [4]
 Prior to 1962 the fiscal year ended November 30. Subsequent to the last day of February and prior to November 30, 1962, it was changed to the last day of February. Hence, no fiscal year ended in 1962 and the figures for the year ending the last day of February, 1963, cover a 15-month period
 
 
 [5]
 See Trico Products Corporation v. McGowan, W.D.N.Y., 67 F.Supp. 311; Hornstein, Corporation Law and Practice, 465
 
 
 [6]
 Ithaca Trust Co. v. United States, 279 U.S. 151, 154, 49 S.Ct. 291, 73 L.Ed. 647; Commissioner of Internal Revenue v. F. G. Bonfils Trust, 10 Cir., 115 F.2d 788, 792
 
 
 [7]
 Wallis v. C.I.R., 10 Cir., 357 F.2d 313, 314; Foster Frosty Foods, Inc. v. C.I.R., 10 Cir., 332 F.2d 230, 232; Anson v. C.I.R., 10 Cir., 328 F.2d 703, 706
 
 
 [8]
 Rollins v. Denver Club, 43 Colo. 345, 96 P. 188, 190, 18 L.R.A.N.S., 733
 
 
 [9]
 Hornstein, Corporation Law and Practice, 477; Knapp v. Bankers Securities Corporation, 3 Cir., 230 F.2d 717
 
 
 [10]
 See Pepper v. Litton, 308 U.S. 295, at 306, 60 S.Ct. 238, at 245, 84 L.Ed. 281, where the court said: 'A director is a fiduciary. * * * So is a dominant or controlling stockholder or group of stockholders. * * * Their powers are powers in trust.'
 See also: In re Norcor Mfg. Co., 7 Cir., 109 F.2d 407, 411; Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389, 396; Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 175, 50 A.L.R.2d 1134, and Hudson v. American Founders Life Ins. Co. of Denver, 151 Colo. 54, 377 P.2d 391, at 393, where the court quoted with approval from Kullgren v. Navy Gas & Supply Co., 110 Colo. 454, 135 P.2d 1007, as follows: 'The relation which directors bear to the stockholders of a corporation, and the corporation itself, as 'universally conceded * * * is a fiduciary one;' and 'The law governing the obligations of fiduciaries is applicable to them.' Mackey v. Burns, 16 Colo.App. 6, 64 P. 485. 'A director of a corporation is in the position of a fiduciary; that is a principle deeply rooted in our law. He owes loyalty and allegiance to his corporation, a loyalty that is undivided and an allegiance that is influenced in action by no consideration other than the welfare of his corporation. He is held 'in official action, to the extreme measure of candor, unselfishness and good faith. Those principles are rigid, essential and salutary." Turner v. American Metal Co., Sup., 36 N.Y.S.2d 356, 369. 'The directors of a corporation act in a strictly fiduciary capacity. Their office is one of trust and they are held to the high standard of duty required of trustees. * * *"
 
 
 [11]
 See meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1; for the oft-quoted words of Justice Cardozo to the same effect; Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 176, 50 A.L.R.2d 1134; Kullgren v. Navy Gas & Supply Co., 110 Colo. 454, 135 P.2d 1007, 1010
 
 
 [12]
 Dodge v. Ford Motor Co., 204 Mich. 459, 170 N.W. 668, 682, 3 A.L.R. 113; Penn v. Pemberton & Penn, Inc., 189 Va. 649, 53 S.E.2d 823; Channon v. H. Channon Co., 218 Ill.App. 397, 400
 
 
 [13]
 Hornstein, Corporation Law and Practice, 477; Knapp v. Bankers Securities Corporation, 3 Cir., 230 F.2d 717, 720; Santarelli v. Katz, 7 Cir., 270 F.2d 762, 768; Doherty v. Mutual Warehouse Co., 5 Cir., 245 F.2d 609, 611, 612
 
 
 [14]
 Atwood v. Kleberg, 5 Cir., 163 F.2d 108, 113; Atwater v. Wheeling & L.E. Ry. Co., 6 Cir., 56 F.2d 720, 723; Bank of United States v. Dandridge, 12 Wheat. 64, 25 U.S. 64, 6 L.Ed. 552; First-Trust Joint Stock Land Bank of Chicago v. Hickock, 367 Ill. 144, 10 N.E.2d 646, 648; Boland v. Mercantile-Commerce Bank, 349 Mo. 731, 163 S.W.2d 597, 607
 
 
 [15]
 See William Waller, 39 T.C. 665, 673, 675